# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CISCO SYSTEMS, INC. and | ) | |
| CISCO TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. NO. 07-113-GMS |
| v. | ) | |
| | ) | |
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT TELCORDIA'S OPENING BRIEF IN SUPPORT OF ITS
## PROPOSED CLAIM CONSTRUCTIONS FOR U.S. PATENT NO. 5,142,622

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Of Counsel:*

Vincent P. Kovalick
Christopher T. Blackford
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000
vince.kovalick@finnegan.com
christopher.blackford@finnegan.com

*Attorneys for Defendant*
*Telcordia Technologies, Inc.*

Dated: May 1, 2008

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1

II.     LEGAL PRINCIPLES FOR CLAIM CONSTRUCTION ................................. 1

        A.      Claim Terms are Construed in Light of the Specification and Prosecution
                History.................................................................................................1

III.    THE '622 PATENT ......................................................................................... 3

        A.      Technology Overview.........................................................................3

        B.      Proposed Constructions of Disputed Claim Terms And Phrases ...........................6

                1.      Construction of "Socket" ..........................................................6

IV.     CONCLUSION................................................................................................. 8

## I.     INTRODUCTION

Defendant Telcordia Technologies, Inc. ("Telcordia") hereby proposes claim constructions for U.S. Patent No. 5,142,622 ("the '622 Patent").[1] Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc. (collectively, "Cisco") allege infringement of claim 7 of the '622 Patent by Telcordia's Element Communicator CE ("Elcom") product.[2]

As to the claim constructions, the parties have done well to agree on many constructions, leaving only one claim term in dispute.  Telcordia's proposed construction for the last limitation in dispute gives that claim term the ordinary meaning it would have to a person of ordinary skill in the art in light of the intrinsic record, that is, the claims, specification, and prosecution history. To the contrary, Cisco's proposed construction for this claim term is largely driven by its need to contend infringement, not by a proper application of the intrinsic evidence.

## II.     LEGAL PRINCIPLES FOR CLAIM CONSTRUCTION

### A.     Claim Terms are Construed in Light of the Specification and Prosecution History.

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc), *cert. denied*, 126 S.Ct. 1332 (2006) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Claim terms are generally given their ordinary and customary meaning to a person of ordinary skill in

---

[1] Since the filing of the Final Joint Claim Chart, the parties have reached an agreement on all but one of the claim terms in dispute.  The only remaining claim term in dispute is the term "socket" in claim 7 of the '622 Patent.

[2] Cisco also alleges infringement of claim 1 of U.S. Patent No. 6,377,988 by Telcordia's Network Monitoring and Assurance System CE product ("NMA") via Telcordia's Elcom or OCS product.  There are no claim terms in dispute for that patent.

the relevant art at the time of the invention. *Phillips*, 415 F.3d at 1312-13. However, the ordinary meaning of claim terms must be viewed in light of the intrinsic record, particularly the specification and prosecution history.[3] *See, e.g., id.* at 1313 and 1315-17; *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).

To begin with, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Next, the claims "must be read in view of the specification, of which they are a part." *Id.* at 1315 (internal citation omitted). "In general, the scope and outer boundary of claims is set by the patentee's description of his invention." *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006). The claims cannot be of broader scope than the invention as set forth in the specification. *Id.* at 1340. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Philips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also On Demand*, 442 F.3d at 1337-38 (*Phillips* "stressed the dominance of the specification in understanding the scope and defining the limits of the terms used in the claim").

Next, the Court should also consider the patent's prosecution history. *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. Accordingly, courts must examine the patent's prosecution history to determine whether the inventor disclaimed a particular interpretation of a claim term

---

[3] The prosecution history consists of the complete record of the proceedings before the PTO, including the prior art considered during examination. *See id.* at 1317.

during the prosecution of the patent in suit. *Id.*; *Advanced Cardiovascular Sys. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001); *Springs Window Fashions LP v. Nova Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) (stating that "[t]he public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.")  Lastly, the court may consider extrinsic evidence, which is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal citation omitted).

**III.     THE '622 PATENT**

**A.     Technology Overview**

Data processing systems communicate with each other using a specified computer language and procedure, otherwise called a protocol.  Protocols are designed to work within a specific network domain or network protocol architecture.  Therefore, a data processing system located in a particular network domain utilizing a network protocol cannot automatically communicate with a different data processing system residing in a different network domain that uses a different network protocol.  The '622 Patent, 1:28-34. (Exhibit A).  Originally, the requirement that data processing systems can only communicate to other data processing systems in the same network domain was a reasonable restriction.  The '622 Patent, 3:3-5.  This simplified program code for the data processing systems because there was only one really useful domain.  The '622 Patent, 3:5-6.  With the advent of the usage of other domains, cross domain connections became desirable.  The '622 Patent, 3:6-9.

Accordingly, various systems and methods were developed to solve the problem whereby data processing systems in different network domains could not communicate.  The '622 Patent, 1:46-3:13.  For example, the '622 Patent states that it was known in the art to solve this problem by changing the program code at the application program level.  The '622 Patent, 1:46-56.  "In

this case, it is known to modify the application in order to reimplement the application to work over another protocol." The '622 Patent, at 1:50-52. It was also known to solve this problem by implementing the same protocol on both machines, allowing the two machines to communicate across the same domain rather than different domains. The '622 Patent, 1:57-2:2.

The '622 Patent describes a "system for interconnecting applications across different networks of data processing systems by mapping protocols across different network domains." The '622 Patent, Title. This is generally referred to in the '622 Patent as a cross domain connection. The '622 Patent, 11:29-32; *see also* Amendment filed February 14, 1992, at 8 (Exhibit B) ("Applicants have further amended Claims 1, 3-7, and 9 to breathe life and meaning to this preamble modification, and these amended claims clearly recite the requisite mapping which is done for dissimilar domains to achieve the claimed cross domain connection."). The patentee states that "[t]he heart of the invention relates to the routing of data between data processing systems operating in these differing network domains." Amendment filed June 29, 1990, at 8 (Exhibit C); *see also id*. at 10 (stating that Applicant's "clearly and distinctly claimed" "a system for communicating between multiple data processing systems operating in separate and distinct network domains" and "a system and method for establishing automatically routed communication between such systems.").

The '622 Patent purports to allow communications between data processing systems in different network domains by automatically routing communications "at the socket level"[4] between the two networks when a cross domain connection attempt is detected. The '622 Patent, 3:20-23; *see also id*. at 3:47-52, 3:62-64, 3:65-4:5, 4:19-23, 4:63-5:5, 7:12-15. Figure 1 of the '622 Patent illustrates a first data processing system 11 (host A) in a network that only supports a

---

[4] The claim term "socket" is in dispute and its meaning is discussed below.

particular domain of sockets, such as TCP.  Data processing system 41 (host C) is within a second, different network that only supports a different domain of sockets, such as SNA. Because data processing systems 11 and 41 are located within different network domains, they cannot automatically communicate.  Figure 1 is reproduced below.



With reference to Fig. 1, "no interconnection can take place" between socket layer 12 of data processing system 11 and socket layer 42 of data processing system 41 "without an intermediate routing facility," because data processing systems 41 and 43 are within different network domains.  The '622 Patent, 4:67-5:5.

Data processing system 31 serves as an intermediate routing facility. "The intermediate facility is the socket routing facility 70 [SRF] in socket layer 32, which exists in data processing system 31, shown as host B."  The '622 Patent, 5:1-5.  "[T]he socket layer which performs the socket routing contains facilities to automatically route a connection across different domains." The '622 Patent, 3:62-64.  Assume a process AA 10 in data processing system 11 needs to communicate with a process CC 40 in data processing system 41.  Process AA 10 activates a

connection through socket layer 12, address family specific socket code 13, and interface 14 to generate a connection request according to network domain "A" protocol. The '622 Patent, 5:6-16, 28-32. Intermediate routing facility 31 receives the connection request at interface 34, converts the protocol from type "A" to type "C" using socket routing facility 70, and forwards the request through interface 35 to data processing system 41. The '622 Patent, 5:28-50. In this manner, the '622 Patent uses sockets and an intermediate routing facility to provide a connection between data processing systems in different network domains, at the socket layer.

### B.      Proposed Constructions of Disputed Claim Terms And Phrases

#### 1.      Construction of "Socket"

| "Socket" The '622 Patent - Asserted Claim 7 | |
| --- | --- |
| Telcordia's Construction | Cisco's Construction |
| an application program interface (API) that was developed for the Berkeley version of AT&T's UNIX operating system for interconnecting applications running on data processing systems in a network. It is an object that identifies a communication end point in a network, can be connected to other sockets, and hides the protocol of the network architecture beneath a lower layer. | an application program interface (API) for interconnecting applications running on data processing systems in a network. It is an object that identifies a communication end point in a network, can be connected to other sockets, and hides the protocol of the network architecture beneath a lower layer. |

Cisco seeks to broaden the definition of "socket" by excluding the fact that it "was developed for the Berkeley version of AT&T's UNIX operating system." But Cisco's attempt to broaden their claims through litigation is inconsistent with both the specification and the prosecution history.

The specification provides a clear definition for "socket." By the patentee's own words, "the term 'socket' has a precise meaning [as] set forth in Applicant's Specification, page 3, line 26, through page 4, lines 1-9:"

> The term "sockets" is an application program interface (API) that was developed for the Berkeley version of AT&T's UNIX[1] operating system for interconnecting applications running on data processing systems in a network. The term socket is used to define an object that identifies a communication end point in a network. A socket can be connected to other sockets. Data can go into a socket via the underlying protocol of the socket, and be directed to appear at another socket. A socket hides the protocol of the network architecture beneath a lower layer. This lower layer may be a stream connection model (virtual circuit), or a datagram model (packet), or another model.

The '622 Patent, 2:23-35, *cited in* Amendment filed June 29, 1990, at 11 (Exhibit C). Where the specification provides a clear definition for a claim term, that definition "is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) (noting that "[b]ecause the patentee provided an explicit definition . . . in the specification, and because no other intrinsic evidence casts doubt on that definition, the patentee's definition controls.") Telcordia's proposed construction mirrors the explicit definition of socket provided by the patentee in the specification, and therefore provides the proper construction of "socket."

Telcordia's construction is also consistent with the prosecution history. In the Office Action mailed March 29, 1990, the Examiner rejected the claims under 35 U.S.C. § 112, second paragraph, stating the terms "socket in a socket layer," "socket layer," "said socket connection," "creating…a socket," "connect a socket," "said socket," and "creating a second socket," were all unclear. Office Action mailed March 29, 1990, at 2-3 (Exhibit D). The Examiner also rejected the claims under 35 U.S.C. § 103(a) as being unpatentable over U.S. Patent No. 4,768,150 in view of U.S. Patent No. 4,736,369.

Patentee distinguished the Examiner's rejections under § 112 and based on the prior art by amending the claims and arguing: "The Examiner will note, now that the Applicant has

cleared up the discrepancy, that ***the use of the term socket has a precise meaning set forth in Applicant's Specification, page 3, line 26, through page 4, lines 1-9***," which corresponds to the above-referenced column 2, lines 23-35 of the '622 Patent.  Amendment filed June 29, 1990, at 11 (emphasis added) (Exhibit C).

Despite having clearly relied on the *entire* definition set forth in column 2 to distinguish the prior art and "clear[] up the discrepancy," Cisco now seeks to create a discrepancy where none should exist.  Cisco asks the Court to modify the "precise meaning" of "socket" that was set forth in the specification, and relied on in the prosecution history to distinguish the prior art, in an effort to grasp an infringement position.  But broadening an unambiguous definition in the intrinsic evidence to cover that which the patentee gave up violates the fundamental principal of public notice.  *See, e.g., Springs Window Fashions LP v. Nova Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) (stating that "[t]he public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.")

Rarely does a patentee so clearly articulate a definition in the specification, delineate the scope of a claim as having that "precise meaning" defined in the specification, and rely on that definition to overcome a rejection based on prior art.  Where the patentee has, "the inventor's intention, as expressed in the specification, is dispositive."  *Phillips*, 415 F.3d at 1316.

## IV.    CONCLUSION

For the reasons discussed above, Telcordia respectfully submits that the Court should adopt its construction for the claim term "socket."

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendant*
*Telcordia Technologies, Inc.*

*Of Counsel:*

Vincent P. Kovalick
Christopher T. Blackford
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C.  20001
(202) 408-4000
vince.kovalick@finnegan.com
christopher.blackford@finnegan.com

Dated:  May 1, 2008

**EXHIBIT A**
**(USP 5,142,622 - Owens Patent)**



# United States Patent [19]

## Owens

[11] **Patent Number:** **5,142,622**

[45] **Date of Patent:** **Aug. 25, 1992**

US005142622A

[54] **SYSTEM FOR INTERCONNECTING APPLICATIONS ACROSS DIFFERENT NETWORKS OF DATA PROCESSING SYSTEMS BY MAPPING PROTOCOLS ACROSS DIFFERENT NETWORK DOMAINS**

[75] Inventor: **Gary L. Owens**, Mountain View, Calif.

[73] Assignee: **International Business Machines Corporation**, Armonk, N.Y.

[21] Appl. No.: **304,696**

[22] Filed: **Jan. 31, 1989**

[51] Int. Cl.5 ............................................. G06F 13/12
[52] U.S. Cl. ............................... 395/200; 364/280.9; 364/284.3; 364/284.4; 364/284; 364/DIG. 1; 395/700; 395/500
[58] Field of Search ...................... 395/200, 700, 500; 364/200 MS File, 900 MS File

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,274,139 | 6/1981 | Hodgkinson | 364/200 |
| 4,322,792 | 3/1982 | Baun | 364/200 |
| 4,415,986 | 11/1983 | Chadra | 364/900 |
| 4,500,960 | 2/1985 | Babecki | 364/200 |
| 4,530,051 | 7/1985 | Johnson | 364/200 |
| 4,575,793 | 3/1986 | Morel | 364/200 |
| 4,586,134 | 4/1986 | Norstedt | 364/200 |
| 4,604,686 | 8/1986 | Reiter | 364/200 |
| 4,612,416 | 9/1986 | Emerson | 379/88 |
| 4,631,666 | 12/1986 | Harris | 364/200 |
| 4,677,588 | 6/1987 | Benjamin et al. | 364/900 |
| 4,679,189 | 7/1987 | Olson | 370/60 |
| 4,703,475 | 10/1987 | Dretzka et al. | 370/60 |
| 4,706,081 | 11/1987 | Hart | 340/825.03 |
| 4,736,369 | 4/1988 | Barzilai | 370/94.1 |
| 4,760,395 | 7/1988 | Katzeff | 370/60 |
| 4,768,150 | 8/1988 | Chang et al. | 364/300 |
| 4,790,003 | 12/1988 | Kepley | 379/88 |
| 4,811,216 | 3/1989 | Bishop | 364/200 |
| 4,825,354 | 4/1989 | Agrawal | 364/200 |
| 4,831,518 | 5/1989 | Yu | 364/200 |
| 4,849,877 | 7/1989 | Bishop | 364/200 |
| 4,855,906 | 8/1989 | Burke | 364/200 |
| 4,882,674 | 11/1989 | Quint | 364/900 |
| 4,893,307 | 1/1990 | McKay | 370/60 |
| 4,901,231 | 2/1990 | Bishop | 364/200 |

### OTHER PUBLICATIONS

Introducing the UNIX System by H. McGilton and R.

Morgan pp. 1–7 McGraw-Hill Software Series.
The UNIX Book by Mike Banahan and A. Rutter, J. Wiley & Sons Inc. 1983 pp. 107–120.
The Design of the UNIX Operating System, by Bach, M. J., 1986, Prentice Hall, Englewood Cliffs, N.J.
Dictionary of Computing, 8th Ed., Mar. 1987, IBM Document Composition Facility pp. 238, 326.
Data Communications, vol. 16, No. 5, May 1987, New York, US, pp. 120–142, "SNA to OSI: IBM Building Upper-Layer Gateways" by Thomas J. Routt.
The Sixth International Phoenix Conference on Computers and Communications Feb. 25, 1987, Scottsdale, Ariz., USA, pp. 354–360 by R. Martinez et al.
IEEE Micro, vol. 5, No. 2, Apr. 1985, New York, US, pp. 53–66, "A Multimicrocomputer-based Structure for Computer Networking" by A. Faro et al.
IEEE Infocom '87, Proceedings, Sixth Annual Conference, Mar. 31, 1987, San Francisco, Calif., USA, pp. 1045–1052, "Gateways for the OSI Transport Service" by G. V. Bochman et al.
Proceedings, Ninth Data Communications Symposium, Sep. 10, 1985, Whistler Mountain British Columbia, pp. 2–8 "Development of a TCP/IP for the IBM/370" by R. K. Brandiff et al.

*Primary Examiner*—Thomas C. Lee
*Assistant Examiner*—Eric Coleman
*Attorney, Agent, or Firm*—Wayne P. Bailey; Marilyn D. Smith

[57] **ABSTRACT**

The system and method of this invention automatically routes a connection between data processing systems in different network domains. As an example, an application running on a data processing system utilizing a network domain such as TCP (Transmission Control Protocol), can automatically make a connection to another data processing system utilizing a different network domain such as SNA (Systems Network Architecture). The connection is automatically performed in the layer containing the communication end point objects. In a preferred embodiment, the connection is automatically performed in the socket layer of the AIX operating system, or in the socket layer of other operating systems based upon the Berkeley version of the UNIX operating system.

**8 Claims, 7 Drawing Sheets**





FIG. 1



FIG. 2



**FIG. 3**

TCORDEL0000004



FIG. 4

TCORDEL0000005



FIG. 5

FIG. 6





**FIG. 7**

TCORDEL0000008

5,142,622

1

## SYSTEM FOR INTERCONNECTING APPLICATIONS ACROSS DIFFERENT NETWORKS OF DATA PROCESSING SYSTEMS BY MAPPING PROTOCOLS ACROSS DIFFERENT NETWORK DOMAINS

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to a network of data processing systems, and more specifically to the interconnection of a plurality of data processing systems between different network protocol domains, such as the different network protocol domains of SNA and TCP/IP.

### 2. Description of the Related Art

A system having multiple domains has at least one data processing system that is interconnected to at least two different data processing systems through at least two different network domains, i.e. network protocol architectures. A problem with multiple domains is the difficulty in allowing communication between machines which are connected to another type of network. For example, a data processing system utilizing SNA LU 6.2 as its network protocol can not automatically communicate with another data processing system utilizing TCP/IP as its network protocol. Both SNA LU 6.2 and TCP/IP are examples of stream protocols where data flows as a stream of indeterminate lengths, and the bytes are delivered in the correct order. The problem is routing a stream of bytes from a data processing system that utilizes a reasonably equivalent protocol, such as a stream protocol, to another data processing system that also utilizes a reasonable equivalent protocol, such as the stream protocol of this example, but wherein the two protocols are not the exact same protocol, such as SNA LU 6.2 and TCP/IP.

It is known to solve the above problem at the application program level. An application program which is running on a data processing system at one end of the connection may be designed to utilize a specific network protocol. In this case, it is known to modify the application in order to reimplement the application to work over another protocol. This requires changing the source program code of the original application by some amount. Depending upon how the application program was originally designed, this may require a substantial amount of changes to the program code.

It is also known to solve the above problem by implementing the same protocol on both machines. For example, in order to use an SNA transaction application running in an SNA network, to apply transactions against data processing systems utilizing a TCP network, one could reimplement that transaction application against TCP by then putting TCP on the client data processing system, put IP over SNA, and gateway between the two. The client data processing system can then be implemented utilizing TCP/IP. The problem with this approach is having to reimplement the application to utilize the different protocol at one end of the

2

network or the other. This is especially burdensome if the application is large and complex.

There are some application level protocols that handshake back and forth over SNA, e.g. 3270 SNA. These have their own data format with meta-data in the data stream. There are other application level protocols, such as Telnet over TCP, that talk back and forth that have meta-data and data in the data stream. However, one can not get these two to talk together since these two have different data and meta-data in their data streams.

If an application utilized one protocol, and that application were to run on a data processing having a different protocol, knowing the data stream format, one could write the client half of the application on the data processing system utilizing the other protocol.

Therefore, in order to extend network connectivity, it is known to reimplement the application to utilize the different protocol, put one protocol on top of the other, and gateway between the two. It is also known to build a larger network utilizing each type of protocol through replication and duplication.

The term "sockets" is an application program interface (API) that was developed for the Berkeley version of AT&T's UNIX[1] operating system for interconnecting applications running on data processing systems in a network. The term socket is used to define an object that identifies a communication end point in a network. A socket can be connected to other sockets. Data can go into a socket via the underlying protocol of the socket, and be directed to appear at another socket. A socket hides the protocol of the network architecture beneath a lower layer. This lower layer may be a stream connection model (virtual circuit), or a datagram model (packet), or another model.

[1] UNIX is licensed and developed by AT&T. UNIX is a registered trademark of AT&T in the U.S.A. and other countries.

A stream connection model refers to a data transmission in which the bytes of data are not separated by any record or marker. A virtual circuit implies that there appears to be one communications end point connected to one other communications endpoint. When the connection is established, only those two end points can communicate with each other.

Sockets are typed by domain (address family or network type), and model type (stream, datagram, etc.). If needed, the socket can be further specified by protocol type or subtype. The domain specifies the addressing concept utilized. For example, there is an internet IP domain, and also a SNA domain for networks utilizing TCP and SNA, respectively. As used herein, the word "domain" is used to refer to the address family of a socket, and not to a domain-naming domain. A domain-naming domain is a concept of a related group of hierarchical addresses, wherein each part of the address is separated by a delimiter, such as a period.

Since a socket is specified by the domain, sockets do not allow cross domain connections. This means that if an application program creates a socket in the Internet (Darpa) domain, it can only connect to sockets in that same domain. Note: "Darpa" is used to specify that Internet, short for internetworking, is not only used herein both to generically specify the internet layer of a particular protocol family which contains means for forwarding, routing control, and congestion control, etc., but also as a name for a particular implementation of an internet called the Internet or the Darpa Internet, or the Arpa Internet. Another name for this internet

5,142,622

3

layer is the Internet Protocol (IP). TCP/IP is also commonly used to refer to this protocol.

Originally, the requirement that a socket can only connect to sockets in the same domain was a reasonable restriction. This simplified the program code when there was only one really useful domain anyway. With the advent of the usage of other domains (specifically SNA), cross domain connections have become desirable. For example, cross domain connections would allow mailers to transport mail among domains. Also, cross domain connections would allow programs to communicate using the existing communication networks.

## SUMMARY OF THE INVENTION

It is therefore an object of this invention to automatically route connections between data processing systems that utilize different protocols, independently of said applications running on said data processing systems.

It is a further object of this invention to route, at the socket level, between two networks when a cross-domain connection attempt is detected.

It is a further object of this invention to facilitate the interconnection between data processing systems by allowing socket based applications to easily span across different networks.

It is a further object of this invention to communicate between data processing systems in which one of the data processing systems utilizes TCP/IP and the other data processing system utilizes SNA.

It is a further object of this invention to communicate between two data processing systems via a third data processing system utilized as a TCP to SNA gateway.

It is a further object of this invention to communicate through a connection between two data processing systems both utilizing TCP on each of their local Internets, by bridging the network connection with a long haul SNA connection.

The system and method of this invention automatically routes a connection between data processing systems, independently of an application running on the data processing systems, having different network domains. The preferred embodiment describes the cross domain interconnections with reference to the different network domains of TCP (transmission control protocol) and SNA (systems network architecture).

The routing is automatically performed at a layer which contains the communication end point objects. In the AIX[2] operating system, and other operating systems based upon the Berkeley version of the UNIX operating system, this layer is called the socket layer.
[2]Trademark of IBM Corporation

An intermediate processing system is utilized to gateway between a processing system utilizing a network domain such as TCP, and another processing system utilizing a different network domain such as SNA. Alternatively, the client data processing system can be implemented utilizing TCP/IP which can then be gatewayed through socket routing on the same machine into an SNA data stream without an intermediate processing system performing the socket routing.

In any event, the socket layer which performs the socket routing contains facilities to automatically route a connection across different domains.

In the client processing system which is attempting to create a connection, a socket is created in a particular domain. If the socket is in a different domain, the socket does not fail if the socket routing facility of this inven-

4

tion is implemented. The connect function is modified to catch the attempts at a cross domain connection. If a connect function is attempted on a socket in a different domain, then the socket routing facility of this invention is invoked.

Alternatively, a connectto function can be implemented which takes the place of and combines the functions of the socket function and the connect function. With the connectto function, a socket is not created until the route is known. This alleviates the unnecessary work of creating a socket which may fail, and then performing actions as a result of the failed socket. The connectto function determines how a connection can be made, and then creates a socket in the domain that is needed to establish the determined connection.

Through either of the above approaches, a connection to a socket in a different domain can be made through an intermediate socket. When data arrives from one end of the connection to the intermediate socket, the intermediate socket immediately sends the data to the other end of the connection instead of queuing the data for process intervention at the intermediate processing system.

In addition, if the intermediate socket is queried for the address of the other end of the connection, the intermediate socket identifies the connecting host as opposed to the intermediate host. In this way, the socket routing facility of the intermediate host is transparent to the hosts at each end of the connection.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a diagram showing a connection from a process AA on host A to a process CC on host C. Socket routing is utilized to cross the boundary between the networks of type A and type C at host B.

FIG. 2 is a flow diagram showing the operational scenario of FIG. 1 using explicit and implicit routing.

FIG. 3 is a flow diagram showing the modified steps in performing a connect ( ) function to a destination.

FIG. 4 is a flow diagram showing the steps of creating a socket if the host does not have a socket in the specified domain.

FIG. 5 is a flow diagram showing the steps performed at host B.

FIG. 6 is a flow diagram showing the steps of a connectto ( ) function.

FIG. 7 is a more detailed diagram of the socket routing facility of this invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

The following description describes an architecture for routing virtual circuits based on sockets. Although this implies stream sockets, the invention is not limited to stream protocols or to sockets. The concepts of this invention could be applied to similar communication end points that are utilized within other operating systems.

Referring to FIG. 1, a process AA, 10, in a data processing system 11, host A, desires to connect its socket facilities 12 to the process CC, 40, in a data processing system 41, host C. The data processing system 11 is shown as only supporting a particular domain of sockets AF—A, 13, such as TCP, and data processing system 41 is shown as only supporting sockets that exist in the domain having address family C, 43. Since the naming conventions and the underlying transport mechanisms

TCORDEL0000010

5,142,622

5

are different between address family A, 13, and address family C, 43, no interconnection can take place without an intermediate facility. The intermediate facility is the socket routing facility 70 in socket layer 32, which exists in data processing system 31, shown as host B.

To describe the initiation of a connection, the process AA, 10, in the data processing system 11, will activate a connection through the sockets programming interface to the general socket code, 12, which in turn goes through the address family specific socket code for AF__A, 13. The necessary data and control information will be handled by the interface and physical access layers, 14. The data will then go out on the network 50 and end up going into data processing system 31, shown as host B, via the interface layer 34, and then through the code for address family 30 A, shown as AF__A, 36.

For comparison, data processing system 21, shown as host D, shows existing internet routing within a single address family, the address family A, AF__A, 23. It should be noted that the cross connection occurs within the address family A, 23. Almost any TCP/IP implementation can route within its own address family. Likewise, SNA has similar gateway and forwarding capabilities. The cross over as shown in data processing system 21 is independent of the model type of either stream or datagram. It is only dependent upon being within the same network domain.

In data processing system 31, the connection request packets will go through the interface layer code 34 to the address family A code, AF__A, 36, through the general socket layer 32, and into the socket routing code 70. The socket routing code facility 70, is where the address mapping and cross connection takes place. The cross connection arrows 37 are shown drawn in the socket routing layer 70 of data processing system 31, as opposed to the cross connection arrows 27 which are shown in the address family code 23 of data processing system 21.

A connection request generated in the socket routing code 70 of data processing system 31 will then go down through the address family C code, AF__C, 33, and through the interface layer code 35 for the other network 60, such as SNA. The connection request packets go across the network 60 to the interface layer code 44, up to the address family C code, AF__C, 43, continuing through the general socket interface layer code 42 where the connection is registered. Then the process CC, 40, can respond to the connection request in order to establish the connection between cross domain networks.

FIG. 7 shows item 70 of FIG. 1 in greater detail. Item 701 is the programs and data for controlling the socket routing facility. A connection request to establish socket routing will come in on the sockets for this service, items 704, and 705. The routing agent software, item 703, will accept the connection, which creates a data socket, items 709–714. The route request message will come in on that data socket, and the routing agent, 703, will consult its route database, 702, to see if a route is possible. If a route is possible, the routing agent, 703, will consult its route database, 702, on how to establish the route. Then, the routing agent creates a matching data socket (item 710 for item 709, etc.), and connects to the next hop. When the routing agent software receives any replies for router hops, it forwards them back to the socket routing requestor via the accepted data socket. When all hops are made, the socket routing agent will create a data transfer agent, items 706–708,

6

that joins the pairs of data sockets, and forwards data from one to the other and vice versa.

The above scenario is further described in the following programming design language code. The following includes examples and uses programs and function names to describe the operational scenario of FIG. 1. The following operational scenario assumes a telnet (or similar program) connected to a remote processing system that is separated by at least one domain boundary. The following uses three machines: "host__A" is connected to "host__B" via TCP, and "host__B" is connected to "host__C" via SNA.

```
*/from application view/*
user on host__A says "telnet host__C"
telnet does a gethostbyname for "host__C"
telnet tries to create a socket for domain of "host__C"
    - it fails
telnet does a getservbyname for sockroute
    - it finds (the only) sockroute available in TCP
      domain
telnet invokes sockroute function to get which domain
    to initiate the connection in (or to get a route
    to host__C)
since telnet knows it is now using socket routing it
    uses the (initial domain and routelist) to
    1. create a socket in its initial domain. (TCP)
    2. connects to sockaddr of "host__C" telnetd
      -or "connectto routelist telnetd"
when socket connect succeeds, proceed as way
    SOCK__STREAM app would
- alternatively ( with connectto() as "full function")
user on host__A says "telnet host__C"
telnet does a gethostbyname (or getaddrbyname) for
    "host__C" - to see if it exists and to get
    host__C's address
telnet does a "connectto ( host__C:telnetd,
    SOCK__STREAM) - which gets a connected socket.
        COPYRIGHT IBM CORPORATION 1988
```

The above program design language code is further explained with reference to FIGS. 2–4. The term "telnet" is a remote terminal emulator having the argument "host__C". This invokes the terminal emulator to a remote host, which in this case is "host C", step 201. FIG. 2. "Gethostbyname" is a function call of the telnet program which gets the addressing information for host C, step 203, FIG. 2. The addressing information for host__C will include a domain and an address within the domain.

At this point, the routing can be performed either explicitly or implicitly. Explicit action would involve the user code invoking a router function, if the initial attempt to create a socket fails. Implicit action would simply be doing a connectto ( ) on the destination address. In explicit routing, the advantage is explicit control by the application. The disadvantages are lack of centralized control, and more complicated user code. In implicit routing, the advantages and disadvantages are just the opposite of those stated above. In implicit routing, the advantages are more centralized control, and less complicated user code. In implicit routing, the disadvantage is that the application does not have direct control.

With explicit routing, Telnet tries to create a socket within that domain, step 204. If the host does not have sockets of that domain, step 205, the socket creation will fail, step 211. At this point, the application, Telnet, invokes a router function, step 213 FIG. 4, if the socket attempt failed, step 211. If the host does have sockets within this domain, the socket attempt will succeed, step 206. If the socket attempt succeeds, the application

TCORDEL0000011

5,142,622

7

does a connect ( ), step 215. The connect ( ) is further shown with reference to FIG. 3. If the connect ( ) succeeds, step 217, FIG. 2, the communication between the two processes proceeds as is typically known in the art, step 207.

If a connect in the same socket domain failed, then (possibly with a socket option set) the socket routing would be invoked. This provides implicit routing, FIG. 3, even in the case of a connection between two domains of the same type, using an intermediate domain of different type.

As shown in FIG. 3, modifying the function connect ( ) enables the connect ( ) to catch those situations in which socket routing is needed to gateway between two like domains using unlike domains. If a normal connection, step 301, fails, step 303, and the failure is due to the destination network being unreachable, step 307, then an attempt at implicit routing will be made. This begins with step 311 where a socket route is sought for the destination. If no route is found, then an error is reported, step 315. If a route is found, a connection is made to the socket routing service at the first hop, step 317. Then, a route request is sent, step 319, and the route request replies are received, step 321, until all the hops are connected, step 323. At this time, a connect up request is sent to tell all of the routers to set up the line for data transmission, step 325. After the connect up reply is received, step 327, the peer address of the destination is set for the local socket, step 329, and an indication of success is returned to the invoker of this connect, step 331.

Referring back to FIG. 2, a connectto function can be added to the generic socket layer code to implement implicit routing from an application level, step 221, FIG. 2. The connectto function is called instead of a socket function and a connect function. The function of the socket system call and the function of the connect are combined into the connectto function. The advantage of this is that the connectto function can handle more addressing issues. Also the connectto function does not need to create a socket in the kernel, which may fail, and then have to act upon the failed socket.

The socket parameters of the connectto function would include the type and the protocol. Since the previous connect call has arguments for the host name, the connectto function would take the name of the host in a more portable form, such as the name of the host in a text stream, whereas, connect takes the name of the host in a socket structure.

Referring to FIG. 6, the connectto( ) function is further described. If connectto( ) is implemented so that it takes a host name as an argument, then it gets the destination address, step 601. Using this address, the function checks the route table for the destination, step 603. If no route is found, step 605, then an error is returned, step 607. If the destination is in the same domain, and no unlike domains are required for gateways, step 609, then a socket is created in the same domain, step 611. A normal connection is established to the destination, step, 612. The route for communication is then established, step 613.

If the destination is not the same domain or unlike domains are required for gateways, step 609, then a socket is created in the domain of the first hop, step 615. A connection to the socket routing service at the first hop is then established, step 617. A route request is sent, step 619, and a reply to the request is received, step 621, until all hops are connected, step 623. After this, a con-

8

nect up request is sent, step 625, and its reply is received, step 627. The peername of the destination is set for the local socket, step 629. The route is now available for normal communications, step 613.

With the following modifications, referred to as socket routing, the creation of a socket can continue, step 213, as shown in FIG. 4, when the host does not have a socket in the specified domain, step 205, FIG. 2. The modifications take place at the client side, host__A. Host__C is referred to as the server.

The telnet application performs a "getservbyname" function for the socket routing service, step 401, FIG. 4. If, for example, the host only has sockets in the TCP domain, telnet will find the only socket route available in the TCP domain, step 403. Next, telnet uses the sockroute function, step 405, to determine the route and what domain of socket to create, step 406. Then, the socket is created for the initial hop of the route, step 412, and then the connection would be set up, step 413. At this point, the application can talk to the host as it otherwise would have with any other socket stream, and in this case, using the telnet data stream, step 414.

Assuming the route initialization is done by a daemon or library function on host__A (and not kernel code), then host__A's socket code doesn't really have much to do with socket routing. Basically, if socket routing is performed outside of the operating system kernel on host__A, then no changes to host__A's socket code need to be made.

The following programming design language code, and the following description with reference to FIG. 5 describes what happens on host__B.

```
*/ on host__B /*
sockroute daemon receive connection from host__A
    (asking for connection to host__C)
sockroute daemon consults route table -or route list
    provided with connection request.
sockroute daemon decides to connectto to host__C via
SNA socket
    (since it is last hop, it doesn't need to connect
    to a sockroute daemon on host__C)
when connection completes, host__B sockroute daemon
    1. sends response back to socket routing on
        host__A
    2. cross connects the TCP and SNA sockets on
        host__B
when routing on host__A receives response, it pulls out
of the way, leaving telnet connected all the way to
host__C
            COPYRIGHT IBM CORPORATION 1988
```

Essentially, the above code describes the scenario in which a service waits around for a connection. With reference to FIG. 5, the sockroute daemon, which runs on host__B, receives connections from other processes requesting its services, step 501. The sockroute daemon is analogous to a telephone operator who is requested to make a connection to another person from a caller. The requesting process, caller, supplies the sockroute daemon, operator, with the necessary connection information in order to make the connection, step 503. Once the sockroute daemon makes the connection, the sockroute daemon leaves the connection. If this connection leads to the final destination, step 505, no other sockroute daemons on a next host need to be called, and the sockroute daemon connects to the final host destination via a SNA socket, step 507. However, it is possible to have multiple sockroute daemons, operators, that are needed to make a connection from a first host to a final host

5,142,622

9

destination. If this connection does not lead to the final host connection, then another sockroute daemon on a next host must be called, step 506, and the above steps repeated.

The sockroute daemon on host—B then sends a response back to the socket routing service on the originating host, host—A, step 509. Host—B cross connects the TCP and SNA sockets on host—B, step 511. When the routing service on host—A receives the response, host—B pulls out of the way. This leaves a telnet connection all the way from host—A to host—B, step 513.

It should be noted that since host—C is the end of the line, its socket layer is entirely unaffected for data transfer purposes.

There is a function called getpeername ( ) that is part of the sockets programming interface. A socket can also be queried as to which service is connected to it. For example, if host—C queried its socket to determine which service at the other end it was connected to, the response would be the intermediate host, host—B, instead of the actual service at the other end of the connection which in this example is host—A. Therefore, the getpeername would need input from the socket routing code at both ends of the connection, as well as some kernel changes, for it to work in a transparent fashion. For transparency, the getpeername would respond with host—A, the real end of the completed connection, if the socket in host—C was queried as to the party at the other end of the connection.

The details of the address mapping and socket routing facilities within the socket layer 32, which effectuates the cross domain connections, are described hereafter.

Gatewaying of socket based protocols is achieved by looping two sockets together at the top end. Such a mechanism would allow a router to create a path that would cross domain boundaries. A router in this context would be program code that would decide how to get to one data processing system to the other such as in the internet layer of TCP/IP. SNA also has similar code. The mechanism for looping two sockets together at the top end would not require file descriptors, or process switching time on the connecting node, once the connection is established. The following illustrates the changes to the socket layer interface of an operating system, such as the AIX operating system that utilizes the Berkeley sockets, that may be made to implement socket routing of this invention. These changes include the following:

modify "connect" to catch cross domain connects

add "connectto" to implement implicit routing from application level.

as an option, create library functions for routing

modify socket buffer handling, etc, to allow cross connections without process intervention

as an option, add function so getpeername works transparently

define socket routing protocol and messages (in kernel or as a daemon)

if needed, modify nameserver for domain gateways and routing info.

If connectto is not used to hide the routing from the user in a library, it is also possible to create library functions to perform the routing. However, the user will require a facility to figure out which machine has a socket routing daemon to service an intermediary. These functions(s) would allow a user program to invoke socket routing with minimal effort. Possible function to be defined are:

10

"get—route"—user program asks for route (useable by connect( ))

"get—type—of—socket—I—shoul-d—open—to—get—to—host"—done against the return from "get—route"—or does implicit "get—route".

connectto"—(1) looks up route, (2) creates a socket in proper domain, (3) established connection.

i.e., instead of
    hp=gethostbyname(host);
    (fill in sockaddr from hp . . . )
    so=socket(AF—XX, SOCK—STREAM,0); connect (so, sockaddr, sockaddrlen);
a program does
    so=connectto(host, SOCK—STREAM, 0);

In addition, modifying socket buffer handling will allow cross domain connections without process intervention. Previously, a socket is set up such that when data arrives, the data is stored in a queue while the data waits for a process to read it. At the gateway, the socket routing machine, when data arrives from one end of the connection, the data has to be automatically sent out the other side to the other end of the connection, and vice versa.

A current implementation of socket buffering would require that a process be running against all the sockets that are cross connected. A more efficient means would be to add this cross connection at a socket buffer layer, so that no process scheduling needs to be done to send the data on its way. In either case, flags are added to the socket data structures.

As previously mentioned, additional function is added to the "getpeername" function to enable the intermediate host to appear transparently in the connection between the originating host destination and the final host destination. Previously, the socket peer address has been handled by protocol dependent means. A change is required so that getpeername( ) works correctly. The change involves having the peer address propagated by the route daemons, in both directions. Then the routing code at each end of the connection would do a "set peer address" operation, which would override the protocol's peer address function.

The socket routing facility of this invention also requires a socket routing protocol and messages. It is desirable that the socket routing code handle routing in a flexible manner. To achieve this, a preferred embodiment of this invention has a socket routing daemon on each machine that is an interdomain gateway. The daemon would be listening on well-known socket(s) for routing requests. When a request came in (via a connecting socket) the routing daemon would examine the request and perform the desired action.

These requests (and their responses) are as follows:

Messages For Socket Routing Protocol
    and the information that goes with each message
    route request—sent to request a route be set up
    originator address
    hop destination address
    flag for intermediate or final hop
    route request reply—received to indicate completion and success/fail of route request
    status for success or failure
    connectup request—sent to establish normal data pathway
    <none>
    connectup reply—received to indicate completion and success/fail of connectup request
    status for success or failure

5,142,622

**11**

The socket routing service code is used to perform routing at the intermediate nodes, i.e. the gateway node. When a request for service arrives at the gateway machine, such as for any other socket connection, the request for service would arrive at a particular socket 5 which would be the socket of the socket routing daemon. The process with this particular socket open could be either in the kernel or running as a user level process.

Therefore, the socket routing service code can be created as a daemon or in the kernel. Preferably, the 10 socket routing service code will exist mostly or completely as a daemon. Some minor parts, such as ioctls (input output controls) to tie sockets together, may exist as part of the kernel. However, these minor parts support the daemon, and are not really a part of the socket 15 routing service code. As an alternative, it is also possible to put the routing implementation part (as opposed to the route figuring out part) in the kernel, which would save process context switch time.

Another modification may be made to implement the 20 socket routing of this invention. The nameserver may be modified for domain gateways and routing information. The (name) domain name server needs to have a type of data for inter(socket) domain gateways. It may also be desirable for it to find gateways when looking up 25 a host address. It would be desirable if it would flag the fact that a host requires an inter(socket) domain gateway to get to it.

While the invention has been particularly shown and described with reference to a preferred embodiment 30 including sockets, the underlying idea of cross domain connections could be achieved with other operating systems having other communication endpoints other than sockets. It will be understood by those skilled in the art that various changes in form and detail may be 35 made without departing from the spirit and scope of the invention.

I claim:

1. A system for communicating between a first data processing system in a first network domain and a sec- 40 ond data processing system in a second network domain, wherein said first network domain has a network protocol architecture different from said second network domain, said system comprising:

at least one communication end point object in a layer 45 of said first data processing system in said first network domain and at least one communication end point object in a layer of said second data processing system in said second network domain;

means, independently of an application running on 50 either of said data processing systems, for automatically establishing, in said layer of said first data processing system and in said layer of said second data processing system, a connection between said first processing system and said second processing 55 system and comprising means for mapping protocols between said first and second network domain; and

means for communicating over said connection between said first data processing system and said 60 second data processing.

2. The system of claim 1 wherein the first network domain is a Transmission Control Protocol and the second network domain is a Systems Network Architecture. 65

3. A system for communicating between a first data processing system in a first network domain and a second data processing system in a second network do-

**12**

main, wherein said first network domain has a network protocol architecture different from said second network domain, said system comprising:

at least one communication end point object in a layer of said first data processing system;

an intermediate data processing system having at least one communication end point object in a layer of said intermediate data processing system;

at least one communication end point object in a layer of said second data processing system;

means, in said intermediate data processing system, for establishing automatically routed connections in said layer of said first data processing system, said layer of said second data processing system and said intermediate data processing system and comprising means for mapping protocols between said first and second network domain, said first and second processing systems each including means for executing respective application programs; and

means for communicating through said automatically routed connections between said first data processing system in said first network domain and said second data processing system in said second network domain.

4. The system of claim 3 wherein said means for communication immediately sends any data received from one end of said routed connection to said other end of said routed connection.

5. The system of claim 3 wherein said first data processing system includes a socket layer of socket code in said first data processing system;

said at least one communication end point object in a layer of said first data processing system is a socket in said socket layer of said first data processing system;

said intermediate data processing system includes a socket layer of socket code in said intermediate data processing system;

said at least one communication end point object in a layer of said intermediate data processing system is a socket in said socket layer of said intermediate data processing system;

said second data processing system includes a socket layer of socket code in said second data processing system;

said at least one communication end point object in a layer of said second data processing system is a socket in said socket layer of said second data processing system.

6. A system for communicating between a first data processing system in a first network domain and a second data processing system in a second network domain, wherein said first network domain has a network protocol architecture different from said second network domain, said system comprising:

at least one socket in a socket layer of said first data processing system in said first network domain;

at least one socket in a socket layer of said second data processing system in said second network domain;

means, independently of an application running on either of said data processing systems, for establishing in said socket layer of said first data processing system and in said socket layer of said second data processing system an automatically routed socket connection between said first data processing system and said second data processing system and

5,142,622

13

comprising means for mapping addresses between said first and second network domain; and

means for communicating through said socket connection between said first data processing system and said second data processing system.

7. A method for communicating between a first data processing system in a first network domain having a socket and a second data processing system in a second network domain, wherein said first network domain has a network protocol architecture different from said second network domain, said method comprising:

establishing, by said first data processing system, a socket in said second data processing system in said second network domain; and

invoking a routing facility to automatically establish a socket connection between said socket in said first data processing system and said socket in said second data processing system when said socket in said second data processing system is established and comprising means for mapping protocols between said first and second network domain;

communicating over said socket connection between said socket in said first data processing system in said first domain and said socket in said second data processing in said second domain; and

executing an application program on each of said first and second processing systems.

14

8. An operating system for use with a plurality of data processing systems for communicating between a first data processing system in a first network domain and a second data processing system in a second network domain, wherein said first network domain has a network protocol architecture different from said second network domain, said operating system comprising:

at least one socket in a socket layer of said first data processing system in said first network domain;

at least one socket in a socket layer of said second data processing system in said second network domain;

means, independently of an application running on either of said data processing systems, for automatically routing, in said socket layer of said first data processing system and in said socket layer of said second data processing system, a socket connection between said first data processing system and said second data processing system and comprising means for mapping addresses between said first and second network domain;

means for establishing said socket connection; and

means for communicating through said socket connection between said first data processing system and said second data processing system, wherein said data first and second processing systems each include means for executing respective application programs.

* * * * *

**EXHIBIT B**
**(Amendment Filed February 24, 1992)**

Response Under 37 CFR 1.116

Expedited Procedure

Examining Group ___232___

PATENT

RECEIVED

FEB 2 4 1992

GROUP 230

#19/37

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of          :    Before the Examiner:

G. L. Owens               :         E. Coleman

Serial No.: 07/304,696     :    Group Art Unit: 232

Filed: 1/31/89             :    Intellectual Property

Title: SYSTEM AND METHOD FOR    :    Law Department

INTERCONNECTING         :    International Business

APPLICATIONS ACROSS     :    Machines Corporation

DIFFERENT NETWORKS OF   :    11400 Burnet Road

DATA PROCESSING SYSTEMS :    Austin, Texas  78758

February 14, 1992

## CERTIFICATE OF MAILING

I hereby certify that this correspondence is being deposited
with the United States Postal Service as first class mail in
an envelope addressed to:  Box AF, Commissioner of Patents
and Trademarks, Washington, D. C. 20231 on February 14, 1991.

Wayne P. Bailey
Attorney for Applicants, Registration No. 34,289

_____    ___2/14/92___
Signature                     Date

## AMENDMENT AFTER FINAL PURSUANT TO 37 CFR 1.116

Honorable Commissioner of Patents and Trademarks

Washington, D. C.  20231

Sir:

In response to the Office Action dated 11/5/91, please

amend the above identified Application as follows:

AT9-88-089                        1

PATENT
07/304,696

IN THE CLAIMS:

1  Claim 1 (Thrice Amended) A system for communicating between a
2  first data processing system in a first network domain
3  and a second data processing system in a second network
4  domain, wherein said first network domain has a network
5  protocol architecture different from said second network
6  domain, said system comprising:

7  at least one communication end point object in a layer
8  of said first data processing system in said first
9  network domain and at least one communication end point
10  object in a layer of said second data processing system
11  in said second network domain;

12  means, independently of an application running on either
13  of said data processing systems, for automatically
14  establishing, in said layer of said first data process-
15  ing system and in said layer of said second data pro-
16  cessing system, a connection between said first process-
17  ing system and said second processing system and com-
18  prising means for mapping protocols between said first
19  and second network domain; and

20  means for communicating over said connection between
21  said first data processing system and said second data
22  processing.

1  Claim 3 (Four Times Amended). A system for communicating
2  between a first data processing system in a first
3  network domain and a second data processing system in a
4  second network domain, wherein said first network domain

AT9-88-089                      2

TCORDEL0000153

PATENT
07/304,696

5   has a network protocol architecture different from said

6   second network domain, said system comprising:

7   at least one communication end point object in a layer

8   of said first data processing system;

9   an intermediate data processing system having at least

10  one communication end point object in a layer of said

11  intermediate data processing system;

12  at least one communication end point object in a layer

13  of said second data processing system;

*D2*

14  means, in said intermediate data processing system, for

15  establishing automatically routed connections in said

16  layer of said first data processing system, said layer

17  of said second data processing system and said interme-

18  diate data processing system and comprising means for

19  mapping protocols between said first and second network

20  domain, said first and second processing systems each

21  including means for executing respective application

22  programs; and

23  means for communicating through said automatically

24  routed connections between said first data processing

25  system in said first network domain and said second data

26  processing system in said second network domain.

Claim 6 (Thrice Amended).    A system for communicating

1   between a first data processing system in a first

2

3   network domain and a second data processing system in a

*D3*

AT9-88-089                    3

PATENT
07/304,696

4 second network domain, <u>wherein said first network domain</u>
5 <u>has a network protocol architecture different from said</u>
6 <u>second network domain,</u> said system comprising:

7 at least one socket in a socket layer of said first data
8 processing system in said first network domain;

9 at least one socket in a socket layer of said second
10 data processing system in said second network domain;

11 means, independently of an application running on either
12 of said data processing systems, for establishing in
13 said socket layer of said first data processing system
14 and in said socket layer of said second data processing
15 system an automatically routed socket connection between
16 said first data processing system and said second data
17 processing system <u>and comprising means for mapping</u>
18 <u>addresses between said first and second network domain;</u>
19 and

20 means for communicating through said socket connection
21 between said first data processing system and said
22 second data processing system.

1 Claim 7 (Thrice Amended).  A method for communicating between
2 a first data processing system in a first network domain
3 having a socket and a second data processing system in a
4 second network domain, <u>wherein said first network domain</u>
5 <u>has a network protocol architecture different from said</u>
6 <u>second network domain,</u> said method comprising:

AT9-88-089                         4

TCORDEL0000155

PATENT
07/304,696

7       establishing, by said first data processing system, a

8       socket in said second data processing system in said

9       second network domain; and

10      invoking a routing facility to automatically establish a

11      socket connection between said socket in said first data

12      processing system and said socket in said second data

13      processing system when said socket in said second data

14      processing system is established <u>and comprising means</u>

15      <u>for mapping protocols between said first and second</u>

16      <u>network domain</u>;

17      communicating over said socket connection between said

18      socket in said first data processing system in said

19      first domain and said socket in said second data pro-

20      cessing in said second domain; and

21      executing an application program on each of said first

22      and second processing systems.

1       Claim 8 (Four Times Amended). An operating system for use

2       with a plurality of data processing systems for communi-

3       cating between a first data processing system in a first

4       network domain and a second data processing system in a

5       second network domain, <u>wherein said first network domain</u>

6       <u>has a network protocol architecture different from said</u>

7       <u>second network domain,</u> said operating system comprising:

8       at least one socket in a socket layer of said first data

9       processing system in said first network domain;

AT9-88-089          5

TCORDEL0000156

PATENT
07/304,696

10    at least one socket in a socket layer of said second

11    data processing system in said second network domain;

12    means, independently of an application running on either

13    of said data processing systems, for automatically

14    routing, in said socket layer of said first data pro-

15    cessing system and in said socket layer of said second

16    data processing system, a socket connection between said

17    first data processing system and said second data

18    processing system <u>and comprising means for mapping</u>

19    <u>addresses between said first and second network domain;</u>

20    means for establishing said socket connection; and

21    means for communicating through said socket connection

22    between said first data processing system and said

23    second data processing system, wherein said data first

24    and second processing systems each include means for

25    executing respective application programs.

D4

## Remarks

Applicants wish to thank the Examiner for the telephone
interview on January 29, 1992.  Although no agreement was
reached, Applicants now better understand the Examiner's
position and present this amendment in response thereto.

Claim 1-7 and 9 are pending in this application, and
stand finally rejected pursuant to the Examiner's Office
Action dated 11/5/91.  The Examiner is requested to reconsid-
er, and withdraw, the final rejection of these Claims 1-7 and
9 based on the following comments.

AT9-88-089                    6

PATENT
07/304,696

Claims 1, 3-7 and 9 were rejected by the Examiner under 35 U.S.C. 102 as being anticipated by Bishop ('877). The Examiner states that Bishop shows communication endpoints in a layers of first and second DP systems, automatic routing means, means for communicating over the routed connection, an intermediate DP system with an endpoint in a layer, means for establishing a socket means in a second DP system, and means and method for executing an application program in first and second processing systems.

In the most recent Office Action, the Examiner further states in paragraph 23 that Bishop teaches communication of messages across domains in a network environment of computers where each domain comprises a differing DP system processing different processes. Applicants traverse this assertion as follows.

Bishop fails to disclose communications between *differing network domains*. As defined in Applicants' Specification, page 1, lines 26-30, network domains mean network protocol architectures. Bishop teaches a *single* application program running by using a plurality of processors. Applicants, on the other hand, are claiming a means and method for allowing *multiple* application programs to communicate with each other over a *cross-domain* network configuration. This is not taught by Bishop, and thus the rejected claims based on this asserted teaching of Bishop was erroneous. Claims 1, 3-7 and 9 include the limitation of connecting data processing systems in differing network domains. This limitation is not described or suggested by Bishop. Rather, Bishop only supports a single domain connection between multiple processors. Differing network protocol architectures are not taught or supported by Bishop.

AT9-88-089                7

TCORDEL0000158

PATENT
07/304,696


After discussion with the Examiner in a telephonic interview, the Examiner stated that the term 'domain' was being given its broad meaning as defined in the dictionary, and not the more limited definition as defined in Applicants' specification. Claims 1, 3-7 and 9 have been amended to clearly show that 'domain' is intended to mean network protocol architecture, as defined in the Specification. This amendment does not result in any new search being required, as the limitations of Claim 2 (which has been previously searched by the Examiner) explicitly recite this limitation for particular protocols. Further, this amendment was not previously possible as Applicants are allowed to be their own lexicographer, and the limitation included in the amended claim preamble had previously been defined in the Specifica-tion, and subsequent amendments expressly stated that this definition was what was intended by Applicants when inter-preting the claims. Thus, the Examiner is requested to enter this amendment to the claims. Applicants have further amended Claims 1, 3-7 and 9 to breath life and meaning to this preamble modification, and these amended claims clearly recite the requisite mapping which is done for dissimilar domains to achieve the claimed cross domain connection. (Specification support at page 18, line 22 through page 22, line 34).

Further, it would not be obvious to modify Bishop to support cross domain connections, as the entire Bishop scheme is based on process tables with appropriate pointer entries (see Bishop Fig. 4) which are similarly used in nodes being interconnected via virtual channel (Bishop, Col. 9, lines 2-10 and Col. 10, lines 16-35). The duplication of some entries and not others between processes allows for kernel determination of whether it is executing a stub or user

AT9-88-089                              8

PATENT
07/304,696

process (Bishop, Col. 10, lines 31-35). If differing domains were being interconnected in Bishop, these tables would have to be specific to the particular domain being interconnected and the Bishop process determination methods would thus become inoperable. This resultant Bishop system would then fail, as no mechanism would exist for a kernel to know how it fit into the overall system and workload parsing. This failure of system operability strongly evidences non-obviousness.

The Examiner also states in paragraph 22 that Bishop teaches that stub processes route packets between processes using an intermediate DP system; and that Bishop teaches means for executing plural programs. To substantiate this statement, the Examiner points to Bishop Col. 5, lines 38-47). This passage fails to disclose the above listed limitations of independent Claim 3, however. Rather, the Bishop passage discusses sending status messages to multiple processors when a process is to be moved from one processor to another processor. It does not disclose 'means for establishing automatically routed connections', as claimed by Applicants. The connections in Bishop are fixed, with no teaching of automatically routing *connections*.

In the telephonic interview, the Examiner reiterated that the cited passage was being read to include rerouting by an intermediate processor, because of the Bishop statement that

> "The kernel of other computers will now direct any signals for olduser process 109 to newuser process 111."

The Examiner's position appears to be that signals could be interpreted to include communication messages generated from

AT9-88-089                              9

PATENT
07/304,696

yet a third computer.  Thus, this third computer would
generate a communication signal to the kernel (in a second
computer), and this kernel would direct the signal to newuser
process (in a first computer).  Applicants stated that the
kernel is only receiving signals which were generated for
processes *internal* to the particular computer which the
kernel was executing upon, and thus no intermediate routing
was occurring, as the Bishop kernel is only directing inter-
nally generated signals.  To substantiate this assertion,
Applicants have attached, in Attachment A, a section from the
book entitled 'UNIX Time-Sharing System: UNIX Programmer's
Manual', by Holt, Rinehart and Winston of Bell Telephone
Laboratories, 1983.  Applicants have also attached, in
Attachment B, Chapter 8 of a book entitled 'The UNIX Operat-
ing System Book" by Banahan and Rutter, 1983.  These articles
will now be discussed in detail to show that the use of the
term 'signal' by Bishop has a very specific meaning in
Bishop's UNIX operating environment context, and that the
interpretation being given by the Examiner is inconsistent
with this meaning.

Referring specifically to Attachment A, it is seen that
UNIX signals are generated by some abnormal event, and that
normally all signals cause termination of the receiving
process.  This is inconsistent with the interpretation given
by the Examiner, where a signal from one processor is re-
ceived by a kernel in another processor and rerouted to yet a
third processor.  This is so for two reasons.  First,
interprocessor communication alleged by the Examiner could
not be construed to be an abnormal event.  Secondly,
interprocessor communications would fail if the signal caused
the receiving process to terminate.  Notwithstanding this
clear distinction, Applicants wish to further direct the

AT9-88-089                    10

TCORDEL0000161

PATENT
07/304,696

Examiner's attention to Bishop, Col. 5, lines 48-53. Here is described that the newuser process must *itself* retrieve any signals which were received by olduser process prior to other computers being notified that the extended process had migrated to computer 104 of Fig. 3. This is further proof that automatic intermediate processor rerouting is not occurring in Bishop, as the receiving processor must manually retrieve messages sent to the alleged intermediate processor. Once the sending processors have been notified of the change in user process location, the sending processors route messages directly to the new user process.

Further, Attachment B, describes the interaction between processes and the kernel in a UNIX environment. Besides containing a general description of how processes interact with a system kernel, pages 116-117 further substantiates that signals are abnormal conditions in UNIX which generally result in process termination. The description of process/kernel interaction is also enlightening in understanding the teachings of Bishop.

Bishop teaches the ability to extend a process over a number of computers (Col. 4, lines 17-18 and Figure 1). The extended process is a collection of individual special processes running on separate computers. These special processes are also referred to as the primary/user process and auxiliary/stub processes. In referring to Figure 3 of Bishop, the primary/user process is located in computer 104, with auxiliary/stub processes existing in computers 101 and 103. Bishop explicitly states that stub processes do not communicate with each other, and that *all communication* from other processes within the system illustrated in Figure 1 are directed to the user process (Bishop, Col. 8, lines 65-68). The user process is in control of the system, and sends

AT9-88-089                    11

PATENT
07/304,696

various messages to the auxiliary processes. There is no teaching or suggestion of interprocess communication between auxiliary processes. Further, there is no teaching or suggestion of automatically routing connections in an intermediate data processing system.

Finally, it should be noted that the Bishop system merely provides for a *single process* to be extended across a plurality of computers (Bishop, Col. 4 lines 31-42 and 51-55). Applicants are claiming in Claims 3-5 and 9 that respective application programs are running in the first and second data processing systems. This is not taught by Bishop.

As all the claimed limitations of amended Claims 1, 3, 6, 9, and dependants thereof, are not taught or suggested by Bishop, the rejection of Claims 1, 3-7 and 9 should be withdrawn.

The Examiner next rejected Claim 2 under 35 U.S.C. 103 as being unpatentable over Bishop in view of McKay. The Examiner relies on the earlier described grounds for rejecting Claims 1, 3-7 and 9, and further adds that McKay taught the use of network protocols SNA and FEP in the automatic establishment of connections between DP system as shown at col. 10, line 29. Applicants traverse this rejection as follows.

First, as Claim 2 contains all the limitations of Claim 1, which has been shown above to be patentable, this dependent Claim 2 is similarly patentable in view of the combination of references.

Further, the McKay reference was improperly combined with the Bishop reference. In establishing a prima facie case of obviousness, the Examiner must present a rationale or reason why the artisan would have been led to do that which

AT9-88-089                              12

PATENT
07/304,696

the claims specify as the invention.  The reason must stem from something suggested by the prior art or from demonstrated common knowledge of the artisan, or both, and not from the inventor's disclosure.  See Uniroval, Inc. v. Rudkin-Wiley Corp., 837 F.2d 1044, 5 USPQ2d 1434 (Fed. Cir. 1988); Ashland Oil, Inc. v. Delta Resins & Refactories, Inc., 776 F.2d 281, 227 USPQ 657 (Fed. Cir. 1985) and In re Sernaker, 702 F.2d 989, 217 USPQ 1 (Fed. Cir. 1983).

It is insufficient that the prior art disclosed the components of the patented device, either separately or used in other combinations; there must be some teaching, suggestion, or incentive to make the combination made by the inventor, Interconnect Planning Corp. v. Feil, 227 USPQ 543, 551 (Fed. Cir. 1985).  The mere fact that the prior art could be so modified would not have made the the modification obvious unless the prior art suggested the desirability of the modification, In re Laskowski, 10 USPQ 2d 1397 (Fed. Cir. 1989).

The motivation asserted by the Examiner to combine such references is that it would be obvious to a person of ordinary skill in the art to combine these references as they were both directed toward a common problem of providing efficient automatic establishment of connections between DP system for providing efficient communication therebetween. The mere fact that a references are directed to solving a general problem of DP communications is insufficient, in and of itself, to justify a proper combination of references.

It should also be noted that the two systems are architecturally distinct, having differing requirements, implementations, and system tradeoffs.  A person of ordinary skill in the art could not merely dissect a single function from one architecture and insert it into a dissimilar architecture.

AT9-88-089                        13

PATENT
07/304,696

Claim 2 has thus been improperly rejected under 35 U.S.C.
103. Specifically, the Bishop teaching requires that the
same operating system be running on each interconnected
computer. The ability to extend a Bishop process across
multiple computers requires this, based on the detailed
Bishop implementation of replicating operating system control
blocks across each computer. The Bishop system is
tightly-coupled, using a common bus for computer interconnec-
tion (see Bishop Fig. 1). The McKay system does not teach
how to modify multiple, tightly coupled computers. McKay's
design is a loosely-coupled computer environment which allows
dissimilar terminals to attach to a host via an incompatible
intermediate network. The terminals do not have an operating
system, much less one that is identical to the host computer
which has been modified as taught by Bishop. A person of
ordinary skill in the art would not be motivated to combine
two such dissimilar systems.

Based on the above, the Examiner is requested to recon-
sider the final rejection of the Claims 1-7 and 9, withdraw
same, and pass these claims to issue as all basis for rejec-
tion have been successfully traversed.

Applicants further request that the Examiner acknowledge
the review of prior art submitted by a Applicants in a
Supplemental IDS dated August 5, 1991, as no document has
been received by Applicants indicating such review.


Respectfully submitted,

G. L. OWENS

BY    _Wailey_____
      Wayne P. Bailey
      Attorney for Applicants
      Registration No. 34,289
      (512) 823-1012


AT9-88-089                    14

Response Under 37 CFR 1.116

Expedited Procedure

Examining Group 232

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

DOCKET NUMBER: AT9-88-089

In re application of: G. L. Owens

Serial No.: 07/304,696

Filed: 1/31/89

RECEIVED

FEB 2 4 1992

GROUP 230

For: SYSTEM AND METHOD FOR INTERCONNECTING APPLICATIONS ACROSS
DIFFERENT NETWORKS OF DATA PROCESSING SYSTEMS

THE COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

Sir:

Transmitted herewith is an Amendment in the above-identified Application.

___X___   No additional fee is required.

_____   The fee has been calculated as shown below:

| | Claims Remaining After Amendment | | Highest No. Previously Paid For | | Present Extra | | Rate | Addit. Fee |
|---|---|---|---|---|---|---|---|---|
| Total | 8 | MINUS | 20 | = | 0 | | x 20 = | $0 |
| Indep. | 5 | MINUS | 6 | = | 0 | | x 60 = | $0 |
| ____ | 1st Presentation of Multiple Dep. Claim | | | | | | x 200 = | $0 |
| | | | | | | | TOTAL | $0 |

_____   Please charge my Deposit Account No. _____ in the amount of $_____.
A duplicate copy of this sheet is enclosed.

___X___   The Commissioner is hereby authorized to charge payment of the following
fees associated with this communication or credit any overpayment to
Deposit Account 09-0451.  A duplicate copy of this sheet is enclosed.

   ___X___   Any additional fees required under 37 CFR §1.16 for the presentation
   of extra claims.

   ___X___   Any patent application processing fees under 37 CFR §1.17.

Respectfully submitted,

By _____

Wayne P. Bailey
Registration No. 34,289
Intellectual Property Law Dept.
IBM Corporation
11400 Burnet Road - 4054
Austin, Texas 78758
(512) 823-1012

# EXHIBIT C
# (Amendment Filed June 29, 1990)



PATENT
07/304,696

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of : Before the Examiner:

   G. L. Owens :    E. Coleman

Serial No.: 07/304,696 : Group Art Unit: 232

Filed: 1/31/89 : Intellectual Property

Title: SYSTEM AND METHOD FOR :    Law Department

   INTERCONNECTING : International Business

   APPLICATIONS ACROSS :    Machines Corporation

   DIFFERENT NETWORKS OF : 11400 Burnet Road

   DATA PROCESSING SYSTEMS : Austin, Texas 78758

June 29, 1990

### CERTIFICATE OF MAILING

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Box Non-Fee Amendments, Commissioner of Patents and Trademarks, Washington, D. C. 20231 on June 29, 1990.

Robert M. Carwell
Attorney for Applicants, Registration No. 28,499

_Robert M. Carwell_     _June 29, 1990_
Signature     Date

### AMENDMENT

Honorable Commissioner of Patents and Trademarks

Washington, D. C. 20231

Sir:

   In response to the Office Action dated March 29, 1990, please amend the above identified Application as follows:

### IN THE CLAIMS:

Cancel Claim 8 without prejudice to Applicant. Please amend Claims 1, 3-7 and 9 as follows:

AT9-88-089        1

TCORDEL0000091

PATENT
07/304,696

Claim 1 (Amended)   A system for communicating between a
first data processing system in a first network domain
and a second data processing system in a second network
domain, said system comprising:

at least one communication end point object in a layer
of said first data processing system and <u>at least one
communication end point object in a</u> said layer of [said]
second data processing system;

means, independently of an application running on either
of said data processing systems, for automatically
[routing] <u>establishing</u>, in said layer <u>of said first data
processing system and in said layer of said second data
processing system</u> [having said at least one communica-
tion end point object], a connection between said first
processing system and said second processing system; and

means for communicating over said [routed] connection
between said first data processing system and said
second data processing.

Claim 3 (Amended)   A system for communicating between a
first data processing system in a first network domain
and a second data processing system in a second network
domain, said system comprising:

at least one communication end point object in a layer
of said first data processing system[.] <u>;</u>

AT9-88-089                  2

PATENT
07/304,696

an intermediate data processing system having at least

one communication end point object in a layer of said

intermediate data processing system;

at least one communication end point object in a layer

of said second data processing system;

[in said layer of an intermediate data processing

system, and in said layer of said second data processing

system;]

means, in said intermediate data processing system, for

establishing automatically routed connections in said

layer of said first data processing system, said layer

of said second data processing system, and said interme-

diate data processing system.

[automatically routing, in said layer having said at

least one communication end point object, a connection]

between said first processing system and said second

processing system; and

means for communicating through said automatically

routed connections [in said intermediate processing

system] between said first data processing system and

said second data processing system.

Claim 4 (Amended)    The system of claim 3 wherein said means

for communication [in said intermediate processing

system] immediately sends any data received from one end

of said routed connection to said other end of said

routed connection.

AT9-88-089                          3

PATENT
07/304,696

Claim 5 (Amended)    The system of claim 3 wherein said first
data processing system includes a socket layer of socket
code in said first data processing system;

said at least one communication end point object in a
layer of said first data processing system is a socket
in said socket layer of said first data processing
system; [said at least one communication end point
object is a socket in a socket layer of each of said
data processing systems.]

said intermediate data processing system includes a
socket layer of socket code in said intermediate data
processing system;

said at least one communication end point object in a
layer of said intermediate data processing system is a
socket in said socket layer of said intermediate data
processing system;

said second data processing system includes a socket
layer of socket code in said second data processing
system;

said at least one communication end point object in a
layer of said second data processing system is a socket
in said socket layer of said second data processing
system.

Claim 6 (Amended)    A system for communicating between a
first data processing system in a first network domain

AT9-88-089                          4

TCORDEL0000094

PATENT
07/304,696

and a second data processing system in a second network
domain, said system comprising:

at least one socket in a socket layer of said first data
processing system [and in said layer of said second data
processing system];

at least one socket in a socket layer of said second
data processing system;

means, independently of an application running on either
of said data processing systems, for establishing in
said socket layer of said first data processing system
and in said socket layer of said second data processing
system an automatically routed socket [automatically
routing, in said socket layer, a] connection between
said first data processing system and said second data
processing system; and

means for communicating through said socket connection
between said first data processing system and said
second data processing system.

Claim 7 (Amended)   A method for communicating between a
first data processing system in a first network domain
having a socket and a second data processing system in a
second network domain, said method comprising:

establishing [creating], by said first data processing
system, a socket in said second data processing system
in said second network domain; and

AT9-88-089                    5

TCORDEL0000095

PATENT
07/304,696

invoking a routing facility to automatically establish a
socket connection between said [connect a] socket in
said first data processing system [to said created] and
said socket in said second data processing system when
said socket [is created] in said second data processing
system is established [network domain]; and

communicating over said socket connection between said
socket in said first data processing system in said
first domain and said [created] socket in said second
data processing system in said second domain.

[Cancel Claim 8.]

Claim 9 (Amended)  An operating system for use with a
plurality of data processing systems for communicating
between a first data processing system in a first
network domain and a second data processing system in a
second network domain, said operating system comprising:

at least one socket in a socket layer of said first data
processing system [and in said layer of said second data
processing system];

at least one socket in a socket layer of said second
data processing system;

means, independently of an application running on either
of said data processing systems, for automatically
routing, in said socket layer of said first data pro-
cessing system and in said socket layer of said second
data processing system, a socket connection between

AT9-88-089                        6

PATENT
07/304,696

said first data processing system and said second data
processing system; [and]

means for establishing said socket connection; and

means for communicating through said socket connection
between said first data processing system and said
second data processing system.

## REMARKS

Claims 1, 3-7 and 9 have been amended herewith and
Claim 8 cancelled without prejudice to Applicant.

In paragraph 16 & 17 of the subject Office Action, the
Examiner has rejected Claims 1-9 under 35 U.S.C. 112, second
paragraph as being indefinite. The Examiner stated that the
scope of meaning of various claim language cited in paragraph
17 is not clear. The Examiner has further noted with respect
to paragraph 19 of the Office Action that antecedent basis is
not clear with respect to various cited claim language, and
in paragraph 21 that as to Claim 8, line 9, the meaning is
ambiguous.

With respect to the foregoing, Applicant believes that
with the claim language amendments herewith submitted, the
grounds for rejecting the claims for the aforesaid reasons
stated by the Examiner are no longer present. And according-
ly Applicant respectfully requests the Examiner to withdraw
rejection of these claims.

In paragraph 18 and 20, with respect to pending claims
cited therein, the Examiner has stated that claim language is
ambiguous, inquiring whether the layers and sockets recited
in the claims are physical or software implemented. The

AT9-88-089                    7

TCORDEL0000097

PATENT
07/304,696

layers and sockets in the context of Applicant's Specifica-
tion may be clearly interpreted by one of ordinary skill in
the art as being software implemented, support for which may
be seen in the excerpt of the "Dictionary of Computing", 8th
edition (March, 1987), copyright 1987, IBM, which has been
submitted herein.  The Examiner is respectfully requested to
withdraw rejection of the claims under 35 U.S.C. 112 on the
grounds of ambiguity.

Claims 1-9 were rejected under 35 U.S.C. 103 as being
unpatentable over Chang in view of Barzilai.

The Examiner is requested to note that Applicant has
invented a system and method for automatically routing a
connection between data processing systems in different
network domains.  In this manner, an application running on a
data processing system utilizing a network domain such as TCP
can automatically make a connection to another data process-
ing system utilizing a different network domain such as SNA.
The term "domain", with reference to Applicant's specifica-
tion, has a precise meaning as set forth therein on page 4,
lines 20-28.

The Examiner is respectfully requested to note that with
respect to every independent claim now pending, there is a
limitation not only in the preamble but in the body of the
claims themselves which call for first and second data
processing systems in respective different first and second
network domains.  The heart of the invention relates to the
routing of data between data processing systems operating in
these differing respective network domains.

Referring first to the Chang '150 reference cited by the
Examiner, the Examiner is first requested to note that Chang
is dealing with a single network domain, e.g. SNA, wherein an
SNA session defines the network path that links two logical

AT9-88-089                        8

TCORDEL0000098

PATENT
07/304,696

units which are communicating (column 2, line 21-29). More
particularly, Chang is dealing with the problem of handling a
change in network protocols. He observed at column 2, line
52, as did Applicant in his Specification on page 2, line 18,
that typically the application program must be rewritten to
adjust the changes. Chang went further to note that a
fundamental deficiency in this approach is lack of an inter-
face to an application program for accessing networking
functions so as to facilitate such adaptation to changing
protocols. Chang thus addressed a problem entirely different
from that of Applicant by providing an interface externaliz-
ing the operating system commands, thereby giving an applica-
tion program direct interaction with a network environment
while obviating the need for intimate knowledge of the
network protocols. An application transaction program was
thereby allowed to access the SNA architecture through the
application's use of the operating system calls. Whereas
Chang observed that his application program interface 20 was
applicable to other systems, the application was to other
systems accessing the identical SNA protocol (column 4, lines
54 et seq). Accordingly, Chang in no way taught or even
remotely suggested Applicant's provision for a system for
communicating between multiple data processing systems
operating in respective different network domains as, for
example, more particularly recited with respect to dependent
Claim 2, for example, wherein the first network domain is a
TCP and the second network domain is an SNA. The Examiner
has stated, in correlating the Chang reference to Applicant's
disclosure, that Chang discloses an independent automatic
routing means. Even assuming, arguendo, that this is true,
Applicant is claiming a system and method for automatically
establishing a connection between data processing systems

AT9-88-089                    9

TCORDEL0000099

PATENT
07/304,696

each in respective different network domains, thereby patentably distinguishing over Chang.

The Examiner has cited Barzilai, '369, as teaching intermediate data processing means in the manner of Applicant for routing communications between remote processing means and, more specifically, with reference to Applicant's Claim 4, that Barzilai has disclosed an intermediate processor acting immediately to send data to a receiving processor.

The Examiner is requested to note that, as with Chang, the main concern in Barzilai related to data processing system transmission in a single network domain, e.g. SNA (column 1, line 57-60). More particularly, whereas Chang was concerned with an application program interface (API) to this single SNA protocol, unlike Applicant's as hereinbefore noted, Barzilai was focusing on the problem of transmission across this single SNA network. Barzilai observed that static or fixed session-level pacing between logical units (LU) in a single structured architecture such as SNA, was a problem in the prior art in controlling flow of information in a communications network. This was due to the fact that packets in a window were fixed at session activation and could not be adjusted dynamically. Thus his contribution was to provide an adaptive session pacing mechanism (column 2, lines 20-30 and lines 51-53), a problem totally foreign to that being addressed by Applicant. It is clear that Barzilai, while appreciating adaptation of his invention to an architecture other than SNA, was not contemplating a system for communication between data processing systems in separate and distinct network domains as clearly recited in Applicant's claims. This may be seen with reference to column 4, lines 34-38 of Barzilai. Moreover, particularly in view of the fact that Chang and Barzilai were not only

AT9-88-089                    10

TCORDEL0000100

PATENT
07/304,696

addressing different problems but also problems completely different from Applicant, the Examiner has cited no reason, as is required, why the teachings of the references would be obvious to combine.  Neither reference either alone or combination, teaches or remotely suggests a system for communicating between multiple data processing systems operating in separate and distinct network domains nor a system and method for establishing automatically routed communication between such systems as clearly and distinctly claimed by Applicant.  Still further, even assuming for the moment that Barzilai teaches a means for communication in an intermediate processing system, as Claim 4 depends from Claim 3 wherein the communicating means includes the limitation of communication between first and second data processing systems each having their own network domains, it is submitted that this patentably distinguishes over the references of record.

In paragraph 30 of the instant Office Action, the Examiner has stated that it is unclear whether the socket layer limitation of Claims 5-9 distinguish over Chang inasmuch as it is unclear whether the recited socket is physical or software-implemented.  The Examiner will note, now that the Applicant has cleared up the discrepancy, that use of the term socket has a precise meaning set forth in Applicant's Specification, page 3, line 26, through page 4, lines 1-9. The sockets called out in Applicant's claims are implemented in respective different network domains and accordingly patentably distinguish over Chang which neither teaches nor even remotely suggests Applicant's sockets, let alone provision for automatically establishing or routing communications between these sockets corresponding to different network domains.

AT9-88-089                          11

PATENT
07/304,696

  For all the foregoing reasons, the Examiner is respect-
fully requested to withdraw rejection of Claims 1-7 & 9 under
35 U.S.C. 103, to allow such claims and to pass this case to
issue.  If the Examiner feels that a telephone conference
with Applicant's attorney would expedite prosecution, he is
requested to contact the attorney at the hereinbelow tele-
phone number.


Respectfully submitted.

G. L. OWENS

BY   *Robert M. Carwell*

Robert M. Carwell
Attorney for Applicants
Registration No. 28,499
(512) 823-1017

RMC/bas

AT9-88-089     12

TCORDEL0000102



IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Case Docket No. AT9-88-089
PATENT

In re application of:   G. L. Owens

Serial No.: 07/304,696

Filed:   1/31/89

For:   SYSTEM AND METHOD FOR INTERCONNECTING APPLICATIONS ACROSS DIFFERENT NETWORKS
OF DATA PROCESSING SYSTEMS

RECEIVED

THE COMMISSIONER OF PATENTS & TRADEMARKS
Washington, D.C.   20231

JUL 05 1990

GROUP 230

Sir:

Transmitted herewith is an Amendment in the above-identified Application.

[X]  No additional fee is required.

[ ]  The fee has been calculated as shown below:

| (Col. 1) CLAIMS REMAINING AFTER AMENDMENT | | (Col. 2) HIGHEST NO. PREVIOUSLY PAID FOR | | (Col. 3) PRESENT EXTRA |
|---|---|---|---|---|
| TOTAL | 8 | MINUS | 20 | = 0 |
| INDEP. | 5 | MINUS | 6 | = 0 |
| [ ] 1ST PRESENTATION OF MULTIPLE DEP. CLAIM | | | | |

| OTHER THAN A SMALL ENTITY | | |
|---|---|---|
| RATE | | ADDIT. FEE |
| x 12= | $ | 0 |
| x 36= | $ | 0 |
| +120= | $ | 0 |
| TOTAL | $ | 0 |

\*   If the entry in col. 1 is less than the entry in col. 2, write "0" in col. 3.
\*\*  If the "Highest No. Previously Paid For" IN THIS SPACE is less than 20, write "20"
in this space.
\*\*\* If the "Highest No. Previously Paid For" IN THIS SPACE is less than 3, write "3" in
this space.
The "Highest Number Previously Paid For" (Total or Independent) is the highest
number found from the equivalent box in col. 1 of a prior amendment or the number of
claims originally filed.

[ ]  Please charge my Deposit Account No. 09-0451 in the amount of $_____.
A duplicate copy of this sheet is enclosed.

[X]  The Commissioner is hereby authorized to charge payment of the following fees
associated with this communication or credit any overpayment to Deposit Account
No. 09-0451. A duplicate copy of this sheet is enclosed.

[X]  Any additional fees required under 37 CFR §1.16 for the presentation of extra
claims.

[X]  Any patent application processing fees under 37 CFR §1.17.

Respectfully submitted,

By _Robert M. Carwell_
Robert M. Carwell
Registration No. 28,499
Intellectual Property Law Dept.
IBM Corporation
11400 Burnet Road - 4054
Austin, Texas 78758   (512) 823-1017

TCORDEL0000103

# EXHIBIT D
# (Office Action dated March 29, 1990)

**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 07/304,696 | 01/31/89 | OWENS | G | AT988099 |

| EXAMINER |
|---|
| COLEMAN, E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 232 | 5 |

MARILYN D. SMITH
IBM CORPORATION
11400 BURNET ROAD, 932/815
AUSTIN, TX 78758

DATE MAILED: 03/29/90

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

[X] This application has been examined   [ ] Responsive to communication filed on _____   [ ] This action is made final.

A shortened statutory period for response to this action is set to expire _three (3)_ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. [X] Notice of References Cited by Examiner, PTO-892.
2. [ ] Notice re Patent Drawing, PTO-948.
3. [X] Notice of Art Cited by Applicant, PTO-1449.
4. [ ] Notice of Informal Patent Application, Form PTO-152
5. [ ] Information on How to Effect Drawing Changes, PTO-1474.

**Part II   SUMMARY OF ACTION**

1. [X] Claims _1-9_ are pending in the application.

   Of the above, claims _____ are withdrawn from consideration.

2. [ ] Claims _____ have been cancelled.

3. [ ] Claims _____ are allowed.

4. [X] Claims _1-9_ are rejected.

5. [ ] Claims _____ are objected to.

6. [ ] Claims _____ are subject to restriction or election requirement.

7. [X] This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. [ ] Formal drawings are required in response to this Office action.

9. [ ] The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings are [ ] acceptable; [ ] not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. [ ] The proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been [ ] approved by the examiner; [ ] disapproved by the examiner (see explanation).

11. [ ] The proposed drawing correction, filed _____ has been [ ] approved; [ ] disapproved (see explanation).

12. [ ] Acknowledgment is made of the claim for priority under U.S.C. 119. The certified copy has [ ] been received [ ] not been received [ ] been filed in parent application, serial no. _____; filed on _____.

13. [ ] Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. [X] Other — _see attached_

PTOL-326 (Rev. 8-86)                    **EXAMINER'S ACTION**

TCORDEL0000083

Serial Number 304696                           Art Unit 232

15.        Claims 1-9 are presented for examination.

16.        Claims 1-9 are rejected under 35 U.S.C.  112, second
paragraph, as being  indefinite for  failing to  particularly
point  out  and distinctly claim the subject matter which
applicant regards as the invention.

17.        The scope of meaning of the following claim language is
not clear:

          a) " layer of said first data processing system"
-- claim 1 (line 6),claim 3 (line 6),claim 7(line 13);

          b) "layer of said second data processing system"
-- claim 1 (line 7),claim 3 (line 8);

          c) "said layer" -- claim 1 (line 10),claim 3,(lines 7,11);

          d) "said routed connection" -- claim 1 (line 14),
claim 3(line 15);

          e)"socket in a socket layer" --. claim 5 (line 2),
claim 9(line 7);

          f) "socket layer" -- claim 6 (line 10), claim 9(line
12);

          g)" said socket connection -- claim 6(line 14),
claim 7(line 12), claim 9(line 16);

          h) "creating...a socket" --claim 7 (line 5);

          i) " connect a socket" -- claim 7 (line 8);

          j) " said created socket" -- claim 7 (line 9),
claim 8(line 13);

          k) "said socket" -- cliam 7 (line 10);

          l)" determining a means to make a connection"
-- claim 8(line 5);

          m)" creating a second socket" -- claim 8 (line 8);

          n) "the determined connection" -- claim 8 (line 9);

          o) " said determined connection" -- claim 8(line 11);
and

                          - 2 -

Serial Number 304696                          Art Unit 232

      p) "said layer of said second...system" -- claim 9 (line 8).

18.    As to 17(a,b) above,the meaning is ambiguous (i.e.,is there a physical layer or a  layer of software or something else being claimed).

19.    As to 17(c,d,j,n,o,p)  above,the antecedent basis is not clear.

20.    As to 17(e,f,g,h,i,k,m)above, the meaning is ambiguous (i.e., is there a physical socket or a software connection or something else being claimed).

21.    As to 17(l) above,the meaning is ambiguous(i.e., it is unclear what criteria is used to make the claimed determination and  it is unclear what determination is being claimed).

22.    The following is a  quotation of 35 U.S.C.  103 which  forms the basis for all obviousness rejections set forth in this  Office action:

> "A  patent  may not be obtained though the invention  is  not identically  disclosed or described as set forth  in  section 102 of this title,  if the differences between  the  subject matter sought to be patented and the prior art are such  that the subject matter as a whole would have been obvious at  the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability  shall not be negatived by the manner in  which the invention was made.  Subject matter developed by another person,  which  qualifies as prior art only under  subsection (f) and (g) of section 102 of this title,  shall not preclude patentability under this section where the subject matter and the  claimed invention were,  at the time the  invention was made, owned by the same person or subject to an obligation of assignment to the same person."

23.    Claims 1-9 are rejected under  35  U.S.C.  103 as  being unpatentable over Chang in view of Barzilai.

24.    <u>Chang</u> taught (e.g., see figs 1-20) applicant's invention substantially as claimed including a data processing ("DP")system comprising :

    a)communication end point object means and method (claims 1,6,7,8,9)(e.g., see col. 3, line 7);

    b) independent automatic routing means and method(20)

- 3 -

Serial Number 304696                          Art Unit 232

(claims 1.6,7,8,9)(e.g., see col. 3. line 18,and col. 5, line 18);

c) means and method for communicating over
routed connection means (claims 1,6,7,8,9) (e.g., see col.3,
line 13).

25.       Chang did not expressly detail(claims 1,6,7,8,9)
that the communication end point means was in a layer of a
first and a second data processing system . Chang , however,
taught data exchange between remote programs (e.g., see col.3,
line 18)and commands and routines that comprise a parameter
that identifies  the connection through a connection ID, a
parameter which identifies a network function request and a
parameter that points to a specific stucture in memory
(e.g., see col.3, lines 45-53). Therefore it would have
been obvious to a routineer in the DP art that Chang's DP system
comprised a communication end point that was in some layer
of the operating system software which was used in communication
between DP systems.

26.       As to the limitations of claim 2, Chang taught
the use of Systems Network Architecture for communication
(e.g., see col. 4, line 43), and accessing a network protocol
(e.g., see col. 4, line 59).

27.       . Chang did not expressly detail (claim 3) an intemediate
system. Barzilai, however, taught an intermediate data
processing means (2) for routing communications between
remote processing means(e.g., see fig. 8 and col. 6, line 34).

28.       It would have been obvious to a routineer in the
DP art to combine the teachings of Chang and Barzalai because
they were both directed toward the problems of providing
efficient program communication via to DP system networks.

29.       As to the  limitations of claims 4, Barzilai taught
the data receiver sending an indication to slow down or stop the

- 4 -

TCORDEL0000086

Serial Number 304696                    Art Unit 232

sending of data when it could not handle the data at the
current transmission rate( e.g.,see col. 3.,line 1) therefore
it would have been obvious to a routineer that in the DP art that
for the slow down or stop indication to be necessary in the remote
communication via an intermediate processor means (2) then
the intermediate processor would have had to immediately
send the data to the receiving processor upon
receipt of the data.

30.    As to the "socket layer limitation of claims 5-9
it is unclear if the claimed invention operated exactly like
Chang's DP system  due to the discrepancy as detailed in
paragraph 20 supra.

31.    As to the operating system limitation of claim 8,
Chang (e.g., see col.3, line 5) and Barzilai(e.g. see
fig.8) further taught that their communication was via
an operating system means.

32.    The  prior art made of record and not  relied  upon  is
considered pertinent to applicant's disclosure.

Burke taught a DP system  for handling  unsolicited
messages from lower tier controllers (e.g., see abstract).

Hart disclosed a DP system for bridging local area
networks (e.g., see abstract).

Babecki disclosed a DP system  for geographically
distributed time-shared communication (e.g., see abstract).

Kepley disclosed a DP system with a message service
system network (e.g., see abstract).

Dretzka disclosed a DP system using multiple
physical links (e.g., see abstract).

Norstedt disclosed a DP system for network
communication (e.g., see abstract).

Emerson disclosed a DP system with integrated message
service (e.g., see abstract).

- 5 -

Serial Number 304696                                        Art Unit 232

        <u>Yu</u> disclosed a DP system for multiprocessor interrupt
rerouting (e.g., see abstract).

33.        Any inquiry concerning this communication or earlier
communications from the examiner should be directed to Eric
Coleman whose telephone number is (703) -557 - 8014.

        Any inquiry of a general nature or relating to the status of
this application should be directed to the Group receptionist
whose telephone number is (703) - 557 - 2878.


EC/ec


                                RUDLEY B. LACHE
                                PRIMARY EXAMINER
                                ART UNIT 232


                            - 6 -

TO SEPARATE, HOLD TOP AND BOTTOM EDGES, SNAP—APART AND DISCARD CARBON

| FORM PTO-892 (REV. 3-78) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | SERIAL NO. 304696 | GROUP ART UNIT 232 | ATTACHMENT TO PAPER NUMBER 5 |
|---|---|---|---|---|

NOTICE OF REFERENCES CITED

APPLICANT(S) Gary L. Owens

**U.S. PATENT DOCUMENTS**

| * | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A | 4 7 6 8 1 5 0 | 8/88 | Chang et al. | 364 | 300 | 9/17/86 |
| | B | 4 7 3 6 3 6 9 | 4/88 | Barzilai | 370 | 94.1 | 6/13/86 |
| | C | 4 8 5 5 9 0 6 | 8/89 | Burke | 364 | 200 | 10/23/87 |
| | D | 4 7 0 6 0 8 1 | 11/87 | Hart | 370 | 61 | |
| | E | 4 5 0 0 9 6 0 | 2/85 | Babecki | 364 | 200 | |
| | F | 4 7 9 0 0 0 3 | 12/88 | Kepley | 379 | 88 | 4/27/87 |
| | G | 4 7 0 3 4 7 5 | 10/87 | Dretzka et al. | 370 | 60 | |
| | H | 4 5 8 6 1 3 4 | 4/86 | Norsted t | 364 | 200 | |
| | I | 4 6 1 2 4 1 6 | 9/86 | Emerson | 379 | 88 | |
| | J | 4 8 3 1 5 1 8 | 5/89 | Yu | 364 | 200 | 8/26/86 |
| | K | | | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT DWG. PP. SPEC. |
|---|---|---|---|---|---|---|---|---|
| | L | | | | | | | |
| | M | | | | | | | |
| | N | | | | | | | |
| | O | | | | | | | |
| | P | | | | | | | |
| | Q | | | | | | | |

**OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)**

| | |
|---|---|
| R | |
| S | |
| T | |
| U | |

| EXAMINER Eric Cl | DATE 3/14/90 |
|---|---|

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)