IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CISCO SYSTEMS, INC., and | ) | |
| CISCO TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | C. A. No. 07-113 (GMS) |
| v. | ) | |
| | ) | |
| TELCORDIA TECHNOLOGIES, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**CISCO SYSTEMS, INC. AND CISCO TECHNOLOGY, INC.'S
ANSWERING CLAIM CONSTRUCTION BRIEF ON
UNITED STATES PATENT NO. 5,142,622**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 North Market Street
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
klouden@mnat.com

*Attorneys for Plaintiffs Cisco Systems Inc. and
Cisco Technology Inc.*

*Of Counsel*:

Matthew D. Powers
Edward R. Reines
Sonal N. Mehta
Weil, Gotshal & Manges
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

David Greenbaum
Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

May 12, 2008

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ...................................................................................................... ii

ARGUMENT ............................................................................................................................... 1

      A.     Telcordia's Proposed Construction Of "Socket" Improperly Imports
            Limitations From The Specification Beyond The Definition Provided By
            The Patentee ...................................................................................................... 1

      B.     Telcordia's Reliance On The File History Is Misplaced ......................................... 3

      C.     In  Balancing The Specification Statement On Which Cisco Relies With
            The Ambiguous File History Relied Upon By Telcordia, Cisco's Proposed
            Construction Should Prevail ....................................................................................... 7

CONCLUSION ............................................................................................................................ 8

# TABLE OF AUTHORITIES

Case(s)                                                                                           Page(s)

*AquaTex Indus., Inc. v. Techniche Solutions,*
    419 F.3d 1374 (Fed. Cir. 2005)............................................................................................8

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)............................................................................8

**ARGUMENT**

**A.     Telcordia's Proposed Construction Of "Socket" Improperly Imports Limitations From The Specification Beyond The Definition Provided By The Patentee**

As the parties' opening claim construction briefs make clear, the parties agree on nearly as much as they dispute when it comes to the single disputed claim term in this case.[1]  The parties agree that, where the patentee has provided a definition for a claim term in the patent specification, that definition should be the controlling construction for that term.  The parties also agree that the inventors of the '622 Patent defined the term "socket" in column 2 of the specification and pointed to this definition during the prosecution history.  The parties' only dispute is which part of the discussion in column 2 constitutes the definition of "socket" and which part is surrounding language that should not be included in the definition of the term.

As explained in Cisco's opening brief, Cisco proposes that the term "socket" be construed as it is defined in the patent specification:

> *The term socket is used to define an object that identifies a communication end point in a network.*

'622 Patent (A1-A15) at 2:27-28.[2]  This is the meaning that a person of ordinary skill in the art reading the '622 Patent would attribute to the term "socket" to mean and what the patentee intended the term to mean.  By Telcordia's own admission, "[w]here the specification provides a clear definition for a claim term, that definition 'is dispositive; it is the single best guide to the meaning of a disputed term.'"  D.I. 41 [Telcordia's Opening Brief] at 7.

---

[1]    Following submission of Cisco's opening brief, it came to Cisco's attention that Exhibit 2 thereto (setting for the parties' agreed constructions for various other claim terms) contained a typographical error.  Specifically, the claim term "generic instruction" in United States Patent No. 6,377,988 was identified as being agreed to by the parties to mean "an instruction applicable to the group of elements" instead of "an instruction applicable to the group**s** of elements."  Cisco submits herewith a corrected version of Exhibit 2 fixing this typographical error.

[2]    Emphasis supplied throughout, unless otherwise noted.

Notwithstanding Telcordia's acknowledgement of this basic principle, its proposed construction ignores it.  Instead of applying the meaning of the term "socket" that is provided in the specification, Telcordia seeks to narrow the scope of the asserted claim by reading in several additional, highly-specific requirements from the general discussion surrounding the patentee's definition of that term.  These requirements include the supposed requirements that (1) sockets were application program interfaces (APIs) developed for the Berkeley version of AT&T's UNIX operating system; (2) sockets can be connected to other sockets; and (3) sockets hide the protocol of the network architecture beneath a lower layer.  In other words, Telcordia attempts to restrict the general term "socket" based on the particular version of the particular system in which certain sockets were developed (i.e., for the Berkeley version of AT&T's UNIX operating system) and possible characteristics that may be attributed to sockets.

A fair reading of the specification does not support Telcordia's interpretation.  Far from limiting the "sockets" of the invention based on the characteristics Telcordia seeks to add to the definition, the specification signals the patentee's intent *not* to limit the claims based on these highly-specific, exemplary characteristics, and instead to impart a general meaning of that term as an object that identifies a communication end point in a network.  The patentee expressly framed these additional characteristics as descriptive of the *development* of the sockets of the preferred embodiment and as characteristics that "*may*" or "*can*" relate to sockets.  On this disclosure, an argument that patentee intended the word "socket" to ***require***

- an object that identifies a communication end point in a network;
- that is an application program interface (API) developed for the Berkeley version of AT&T's UNIX operating system;
- that is connected to other sockets; ***and***
- that hides the protocol of the network architecture beneath a lower layer.

simply does not comport with the specification.

It is thus not surprising that Telcordia's attempt to import these supposed requirements from the specification into the construction of the word "socket" has almost nothing to do with the specification itself.  In fact, Telcordia's opening brief devotes only a few lines of text to discussion of the specification on which it claims to rely so heavily.  Instead, Telcordia bases its argument on a single sentence from the file history of the '622 Patent, a sentence which, according to Telcordia, sweeps all of these additional comments from column 2 of the specification into the definition of the word "socket."  *See* D.I. 41 [Telcordia's Opening Claim Construction Brief] at 6-8.

As explained below, just as with the specification, Telcordia's proposed claim construction cannot be squared with a fair reading of the file history.

**B.**     **Telcordia's Reliance On The File History Is Misplaced**

Telcordia relies on a June 29, 1990 Amendment in which the patentee, responding to remarks by the patent examiner in a preceding Office Action, explained that any ambiguity as to whether "sockets" were physical or software-implemented had been cleared up by the definition included in the specification as set forth at page 3 line 26 to page 4 lines 1-9 (ultimately column 2, lines 23 to 37 of the '622 Patent).  *See* June 29, 1990 Amendment (A23-A35) at A33.  Telcordia interprets this single sentence as delineating the entire passage at column 2, lines 22-35 as the definition of "socket," arguing that the patentee overcame a rejection over the prior art by incorporating these requirements into the definition of "socket,"  *See* D.I. 41 [Telcordia's Opening Claim Construction Brief] at 8.  But when the discussion in the file history of the term "socket" is viewed in the context of the dialogue between the patent examiner and the patentee, as it must be, Telcordia's arguments fails.

In the March 29, 1990 office action, the patent examiner rejected all proposed claims over the Chang reference in view of the Barzilai reference.  *See* March 29, 1990 Office Action (A16-A22).  The examiner provided several pages of comments explaining why he considered the proposed claims to be invalid over the prior art and how specific limitations of the proposed claims purportedly were taught in Chang and Barzilai.  *Id.* at A17-A20.  The patent examiner went through each claim limitation individually and explained where he believed Chang expressly disclosed the limitation, or, if not expressly disclosed, how he believed it would have been obvious to combine Chang with Barzilai to arrive at the limitation.  *Id.* With respect to the "socket layer limitation" in proposed claims 5-9, however, the examiner *did not* explain how that limitation was expressly disclosed in Chang or why it would be obvious in light of Chang and Barzilai.  Instead, the patent examiner commented that "[a]s to the 'socket layer limitation of claims 5-9 it is unclear if the claimed limitation operated exactly like Chang's DP system due to the discrepancy detailed in paragraph 20 supra," referring to his earlier comment that the meaning of the terms "socket in a socket layer," "socket layer," "said socket connection," "creating . . . a socket," "connect a socket," "said created socket" and "said socket" was ambiguous because it was unclear whether there is a "physical socket or a software connection or something else being claimed."  *Id.* at A18, A20.

In response, on June 29, 1990, the patentee submitted an Amendment providing several pages of detailed explanation as to why the proposed claims were not invalid over Chang and Barzilai.  *See* June 29, 1990 Amendment (A22-A35) at A29-A34.  In addressing the "socket" limitations,  the patentee first responded to the examiner's concern that the meaning of "socket" as used in the claims was ambiguous, explaining that the sockets of the invention were defined in the patent specification and that that definition was operative:

record.

> In paragraph 30 of the instant Office Action, the Examiner has stated that it is unclear whether the socket layer limitation of Claims 5-9 distinguish over Chang inasmuch as it is unclear whether the recited socket is physical or software-implemented. The Examiner will note, now that the Applicant has cleared up the discrepancy, that use of the term socket has a precise meaning set forth in Applicant's Specification, page 3, line 26, through page 4, lines 1-9.

The sockets called out in Applicant's claims are implemented in respective different network domains and accordingly patentably distinguish over Chang which neither teaches nor even remotely suggests Applicant's sockets, let alone provision for automatically establishing or routing communications between these sockets corresponding to different network domains.

AT9-88-089                        11

*See* June 29, 1990 Amendment (A23-35) at A33. The patentee then argued that the sockets of the invention were patentably distinguishable over the prior art, because, unlike Chang, the invention's sockets were implemented in different network domains:

In paragraph 30 of the instant Office Action, the
Examiner has stated that it is unclear whether the socket
layer limitation of Claims 5-9 distinguish over Chang inas-
much as it is unclear whether the recited socket is physical
or software-implemented.  The Examiner will note, now that
the Applicant has cleared up the discrepancy, that use of the
term socket has a precise meaning set forth in Applicant's
Specification, page 3, line 26, through page 4, lines 1-9.
The sockets called out in Applicant's claims are implemented
in respective different network domains and accordingly
patentably distinguish over Chang which neither teaches nor
even remotely suggests Applicant's sockets, let alone provi-
sion for automatically establishing or routing communications
between these sockets corresponding to different network
domains.

AT9-88-089                      11

*Id.*

These remarks make clear the patentee was addressing two separate inquiries relating to sockets:  resolving the ambiguity the examiner saw in the use of the term "socket" and explaining that the "sockets" of the invention were distinguishable over the prior art.  In neither case did the patentee expand the definition of "socket" to include the entire discussion of sockets in column 2, including the supposed characteristics that Telcordia now seeks to import into the meaning of "socket," i.e., that sockets (1) were application program interfaces (APIs) developed for the Berkeley version of AT&T's UNIX operating system; (2) can be connected to other sockets; and (3) hide the protocol of the network architecture beneath a lower layer.

At the outset, it is clear that the patentee's reference in the Amendment to column 2, lines 23 to 37 of the '622 Patent related to the first issue —resolving the examiner's concerns as to ambiguous claim language—and not the second.  This is not surprising.  Because the

6

examiner did not reject the claims over Chang and Barzilai based on the claimed "sockets," let alone based on the ambiguity that the examiner identified as to whether sockets were physical or software-implemented, the patentee had no reason to distinguish the prior art on this basis. Telcordia's suggestion that the patentee pointed to the specification discussion of sockets to overcome the prior art is simply not in line with the specification.

Moreover, setting aside the question of whether the patentee distinguished the prior art on the basis of the additional requirements Telcordia seeks to add now, Telcordia's suggestion that the prosecution history clearly delineates the entire column 2 passage as within the scope of "socket" also fails. The patentee was addressing the issue of potential ambiguity of the term "socket" as physical or software-implemented, and resolved that ambiguity by reference to the definition of the term in the specification. A fair reading of these remarks suggests that the patentee intended not to invoke the various specification statements relating to the development and potential characteristics of sockets as limitations for that claim term, but instead to point to that passage as containing a definition of "socket" that would eliminate ambiguity as to that term. *See* June 29, 1990 Amendment (A23-A35) at A33. For Telcordia to suggest that this explanation somehow expands the definition of "socket" in the specification to include the entire discussion of sockets in column 2 reads far more into this explanation than is reasonable and simply does not comport with the context of these remarks. At best, these statements are ambiguous.

**C.     In  Balancing The Specification Statement On Which Cisco Relies With The Ambiguous File History Relied Upon By Telcordia, Cisco's Proposed Construction Should Prevail**

As Telcordia itself was forced to admit, "[r]arely does a patentee so clearly articulate a definition in the specification." D.I. 41 [Telcordia's Opening Brief] at 8. Here, that definition is simple and direct:  "[t]he term socket is used to define an object that identifies a communication end point in a network." By Telcordia's own admission, "[w]here the

specification provides a clear definition for a claim term, that definition 'is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* at 7 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc)).  Cisco's proposed construction embraces this definition and effectuates this fundamental principle.  In contrast, Telcordia relies on a strained reading of a file history that is, at best, ambiguous.

Under these circumstances, the specification statement on which Cisco relies should control and Telcordia's proposed claim construction should be rejected.  The Federal Circuit has made clear that "[b]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *See Phillips*, 415 F.3d at 1317.  Where the file history is ambiguous, courts have repeatedly declined to give it weight over other evidence.  *See, e.g., AquaTex Indus., Inc. v. Techniche Solutions,* 419 F.3d 1374, 1380-81 (Fed. Cir. 2005) (reversing district court's claim construction which relied heavily on  statements made during the prosecution history based on a holding that the prosecution history was ambiguous where the examiner had rejected the claims over the prior art based on the requirement at issue in claim construction but the patentee had traversed a rejection over the prior art on different grounds).  Here, the evidence compels the same result.

## CONCLUSION

For the reasons set forth in Cisco's opening brief and herein, the Court should adopt Cisco's proposed claim construction for the disputed term "socket" in the '622 Patent.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 North Market Street
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
klouden@mnat.com
*Attorneys for Plaintiffs Cisco Systems Inc. and*
*Cisco Technology Inc.*

*Of Counsel*:

Matthew D. Powers
Edward R. Reines
Sonal N. Mehta
Weil, Gotshal & Manges
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

David Greenbaum
Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

May 12, 2008

2325433

## CERTIFICATE OF SERVICE

I certify that on May 12, 2008 I electronically filed the foregoing with the Clerk

of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Steven J. Balick
John G. Day
Tiffany Geyer Lydon
ASHBY & GEDDES

I further certify that I caused copies to be served upon the following on

May 12, 2008 in the manner indicated:

## BY E-MAIL & HAND DELIVERY

Steven J. Balick, Esquire
John G. Day, Esquire
Tiffany Geyer Lydon, Esquire
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE  19801

## BY E-MAIL

Vincent P. Kovalick
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER L.L.P.
901 New York Avenue, N.W.
Washington, D.C.  20001


*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)

# Exhibit 2

**(Corrected)**

## AGREED CONSTRUCTIONS

The parties have agreed on the following constructions:

United States Patent No. 6,377,988, Claim 1

       1.       "predetermined function" in claim 1 means "a function that has been determined beforehand."

       2.       "group-specific instruction" in claim 1 means "an instruction in a format that is understood and can be processed by each network element of a specific group."

       3.       "generic instruction" in claim 1 means "an instruction applicable to the groups of elements."

United States Patent No. 5,142,622, Claim 7

       1.       "network domain" in claim 7 means "the address family of a socket, and not a domain-naming domain.  A domain naming domain is a concept of a related group of hierarchical addresses, wherein each part of the address is separated by a delimiter such as a period."

       2.       "network protocol architecture" in claim 7 means "network domain."

       3.       "data processing system" in claim 7 means "a system for executing application programs."

       4.       "routing facility" in claim 7 means "a facility that establishes a socket connection between the sockets in the first and second data processing systems."

       5.       "socket connection" in claim 7 means "a communication path between a first socket and second socket with an intermediate routing facility between the

first socket and the second socket, the routing of the communications being performed at the socket layer."

6.     "means for mapping protocols between said first and second network domain" in claim 7 is a means-plus-function limitation subject to 35 U.S.C. § 112(6).  The claimed function is mapping protocols between the first and second network domain.  The corresponding structure is software within socket layer 32 as described at 9:30-11:19, and hardware executing that software, and equivalents thereof.